STATE OF ARIZONA, a body politic, Acting By and Through the ARIZONA DEPARTMENT OF TRANSPORTATION

v.

**The UNITED STATES.**

No. 275–75.

United States Court of Claims.

April 19, 1978.

Richard Kamps, Phoenix, Ariz., for plaintiff, Bruce E. Babbitt, Donald O. Loeb, and Stanley Z. Goodfarb, Phoenix, Ariz., of counsel.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before COWEN, Senior Judge, NICHOLS and BENNETT, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge.

This contract case comes before the court on cross-motions for summary judgment. Plaintiff claims defendant has breached a contractual obligation to furnish prison inmate labor on a road construction project in a national forest in Arizona. Jurisdiction is established under 28 U.S.C. § 1491.

I

On July 1, 1958, an "Agreement and Memorandum of Understanding" was signed by the Bureau of Prisons of the United States Department of Justice, the Forest Service of the United States Department of Agriculture, the Bureau of Public Roads of the United States Department of Commerce, the Arizona State Highway Department,[1] and the Board of Supervisors of Graham County, Arizona. The agreement recited that Arizona Forest Highway Route 34 (Swift Trail), "presently a narrow, low-type, one-way, hazardous road with many sharp turns and steep grades," required improvement over a stretch of approximately 26 miles within the Coronado National Forest, located in southeastern Arizona. Improvement of the existing road, plus realignment of its steepest and most hazardous portion, was deemed necessary to facilitate motor vehicle access to the recreational areas of Graham Mountain, to facilitate the fighting of frequent forest fires on the mountain, and to permit increased logging operations. The parties agreed to cooperate with respect to the construction of the improved road, each party undertaking different obligations. The Bureau of Public Roads agreed to furnish an engineer, engineering services, and certain materials, subject to the availability of federal funds. The Forest Service expressed its intention to join with the Bureau of Public Roads in

1. Now known as the Arizona Department of Transportation.

approving annual Forest Highway programs and agreed to provide all necessary rights-of-way across national forest land and to permit the establishment of a federal prison camp on national forest land. The state agreed both to recommend a continuous and uninterrupted annual program until the project's completion and to cooperate in every way possible to accomplish the undertaking, but it was not bound to contribute funds. The county agreed to furnish all necessary rights-of-way across private lands, to provide supervisory personnel, to supply equipment, and to maintain the highway during and after construction.

The Bureau of Prisons, whose undertaking is crucial to the claims brought by plaintiff, agreed to establish and maintain at Government expense a camp for federal prisoners and to provide prison inmate labor for the construction work.

Two years later, on July 1, 1960, a modification of the original agreement was entered into by all parties to the 1958 agreement. The modification recited that the state, having designated portions of Route 404 of the Arizona federal-aid secondary system and of Forest Highway Route 34 to be a part of the Arizona state highway system, would, with respect to those segments (and others later to be designated part of the state highway system), undertake certain obligations which the 1958 agreement assigned to Graham County, including such tasks as supplying skilled workmen and a foreman and providing heavy equipment. All portions of the 1958 agreement which were not modified in the 1960 document were expressly agreed to remain in "full force and effect."

In accordance with these agreements, a federal prison camp was established near Safford, Arizona, and all parties went forward with performance of the acts contemplated by the agreements. By the end of 1960, the state had taken into its state highway system a stretch of road 28⅓ miles long, running from U.S. Route 666 to the Columbine Ranger Station. Construction began on August 3, 1959, and continued unabated until April 30, 1974. During this period, just over 4 miles of the road were rebuilt at its lower end, and 1.4 miles were completed on the upper section. Of the rest of the proposed construction, almost 7 miles were commenced but never completed, while other areas were never begun. Plaintiff claims that it spent more than $1.6 million in connection with the project and that $1,214,794.50 of that sum was spent on construction and maintenance of new sections of the alignment which will remain unuseable unless the project is completed and they are linked to the existing alignment. Plaintiff claims the latter sum, together with certain other costs.

The cessation of work on the project was the result of a decision by the Bureau of Prisons to remove prison inmates from the project. Although the inmates were withdrawn from the project on April 30, 1974, that action followed a letter, dated October 9, 1973, from the administrator of the federal prison camp at Safford advising plaintiff of defendant's intent to terminate its relationship with the road construction project. That decision was ultimately made by the Director of the Bureau of Prisons, who has stated his two primary reasons were concern about potential injuries to inmates (and liability therefor) and the availability of other work assignments at Safford, including work at Prison Industries (introduced at Safford about 1973). The Director also grounded his decision in considerations of the environment and effective use of available funds.

Plaintiff claims in count I of its petition that the removal from the project of federal labor was a breach of an express contract. Count II, alternatively, argues there was a breach of an implied contract. Plaintiff invokes estoppel against defendant in count III. Lastly, plaintiff asserts in count IV that, even if no contract existed and estoppel cannot be applied, plaintiff is entitled to the reasonable value of the services it rendered and the materials it supplied because it conferred a benefit upon the United States upon the express request of the latter.

Defendant moved first for summary judgment, contending that the breach and estoppel arguments are dependent upon a showing by plaintiff that those who purported to act for the Government had authority to bind it contractually, which burden defendant says plaintiff cannot meet. Defendant argues further that count IV is based upon *quantum meruit* or a contract implied-in-law and thus is outside the court's jurisdiction. We turn first to the issues relating to the express contract claim, which we find dispositive.

II

Plaintiff's central argument is that the 1958 agreement and the 1960 modification constituted an express contractual obligation of the Bureau of Prisons to provide inmate labor for the Swift Trail project. The parties have focused their arguments on the question of whether there was authority to bind the Government to provide convict labor. Defendant does not deny the existence of an express contract if it was legally authorized.

■ We begin this discussion by reiterating venerable principles. The Government is not contractually bound by the unauthorized acts of its agents. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Plaintiff, to recover on a purported contract with the Government, must show that those who acted for the Government acted within their authority. *Housing Corp. of America v. United States,* 468 F.2d 922, 925, 199 Ct.Cl. 705, 711 (1972). Upon analysis, we conclude that plaintiff has met this burden.

Plaintiff relies heavily on 18 U.S.C. § 4125 to establish the authority of the Attorney General (and through him, the Director of the Bureau of Prisons) [2] to make a contract promising to establish a prison camp and to provide federal prisoners to work on the project. The statute provides:

§ 4125. *Public works; prison camps*

(a) The Attorney General may make available to the heads of the several departments the services of United States prisoners under terms, conditions, and rates mutually agreed upon, for constructing or repairing roads, clearing, maintaining and reforesting public lands, building levees, and constructing or repairing any other public ways or works financed wholly or in major part by funds appropriated by Congress.

(b) The Attorney General may establish, equip, and maintain camps upon sites selected by him elsewhere than upon Indian reservations, and designate such camps as places for confinement of persons convicted of an offense against the laws of the United States.

(c) The expenses of transferring and maintaining prisoners at such camps and of operating such camps shall be paid from the appropriation "Support of United States prisoners", which may, in the discretion of the Attorney General, be reimbursed for such expenses.

(d) As part of the expense of operating such camps the Attorney General is authorized to provide for the payment to the inmates or their dependents such pecuniary earning as he may deem proper, under such rules and regulations as he may prescribe.

(e) All other laws of the United States relating to the imprisonment, transfer, control, discipline, escape, release of, or in any way affecting prisoners, shall apply to prisoners transferred to such camps.

This statute was cited in the 1958 agreement as permitting the provision of inmate labor to the project and the establishment of a federal prison camp. The agreement said, in part:

Whereas, the Act of June 25, 1948 (62 Stat. 852, 18 U.S.C.A. Sec. 4125) authorizes the Attorney General of the United States to establish, equip, and maintain camps, upon sites selected by him, for confinement of Federal prisoners, and to

2. The Director obtained the approval of the Attorney General before executing both the 1958 agreement and the 1960 modification.

make available to the several departments of the Federal Government the services of Federal prisoners for constructing and repairing roads, and for other public ways or works, under such terms and conditions as may be mutually agreed upon; and

Whereas, the construction of this route by the use of Federal prison labor wholly supported by funds designated by the Act of June 25, 1948, would not place such Federal prison labor in competition with free labor for the reason that if the route is not constructed with Federal prison labor it cannot be constructed by any other means as funds for its improvement and relocation are not now available and are not expected to be available for many years; and this type of work program in an out-of-door environment, offers particular advantages for the rehabilitation of men convicted for violation of Federal law; * * *

For the 14½ years that inmate labor was provided to the Swift Trail project, this statute was relied upon for defendant's authority. Defendant agrees that this statute authorizes the use of inmate labor on the project, but denies that authority is there conferred to enter into contracts obligating the United States to nonfederal entities. Defendant emphasizes that the statute speaks in terms of making United States prisoners available "to the heads of the several departments." 18 U.S.C. § 4125(a). This, plaintiff does not deny, and it seems to concede that the quoted language refers only to *federal* departments,[3] yet it focuses on that part of the statute which says eligible public projects include those "financed wholly *or in major part* by funds appropriated by Congress" (emphasis supplied).[4]

Plaintiff infers from the italicized words that the statute contemplated that inmate labor would be involved in projects which involve *non*federal entities. This is grounded on the assumption that projects not entirely financed by congressional appropriations must be financed in part from other sources, as here. Further, plaintiff notes, the statute authorizing the provision of prisoners speaks of "terms, conditions, and rates mutually agreed upon," language which appears to contemplate the formation of contractual obligations. Coupling the two propositions permits the conclusion that the statute grants authority to make contracts involving the promise of inmate labor, to which contracts nonfederal entities may be parties.

■■ This argument has some merit. It is true, as defendant emphasizes, that the statute allows inmate labor to be provided only to federal departments. But it is also true that the provision of such labor to another federal department may occur in the context of a project involving nonfederal entities as well. If, as plaintiff says, the Bureau of Prisons was authorized to make contracts in which the provision of convict labor would be promised, we think it would be reasonable to say that nonfederal entities, such as Arizona, might be parties to such contracts and have actionable claims on the breach of promises made therein upon which they were induced to rely. In short, we do not believe that the statute's limitations as to whom the labor may be provided (federal departments only) necessarily defines the scope of persons to whom binding promises can be made about the provision of inmate labor.

Defendant argues, however, that the statute does not authorize *any* contracts,

---

3. This, the plain meaning of the statute, was the interpretation expressly given to the statute in the 1958 agreement, as shown by the above quotation from the agreement.

4. The first statute authorizing the use of federal prisoners on road construction projects limited eligible projects to ones "the cost of which is borne exclusively by the United States." Ch. 336, 45 Stat. 1318 (1929). After an intermediate step in 1930, ch. 340, § 2, 46 Stat. 391, the restriction was completely eliminated when the criminal code was revised and enacted into positive law in 1948. Ch. 645, 62 Stat. 852 (1948). Since that time, the statute has authorized the provision of federal prisoners on road or other public ways or works projects "financed wholly or in major part by funds appropriated by Congress." 18 U.S.C. § 4125. Defendant does not dispute that the project was so financed.

even among federal entities. Nothing in the statute expressly mentioned contracts; instead, it mentions "terms, conditions, and rates mutually agreed upon." This cannot refer to contracts, defendant assures us, because there is enough power in the executive branch to resolve disputes between federal departments so that arrangements between such departments need not be made by contract. We find this argument strained. Federal departments frequently do contract among themselves, and the statute here in issue does not clearly indicate that such routine practices were forbidden with regard to prison labor. The statute's reference to "terms, conditions, and rates" is language commonly associated with contracts. Particularly since we believe Congress could have envisioned that nonfederal entities would be parties to agreements in which prison labor would be promised, we favor the broader interpretation of the statute. Since it reasonably appears that contracts were authorized, we decline to adopt defendant's construction of the statute in this case.

Additional support for plaintiff's view can be derived from 18 U.S.C. §§ 4041 and 4042. The latter section places the management and regulation of all federal penal and correctional institutions under the control of the Bureau of Prisons, while the former statute entrusts responsibility for that Bureau to its Director, who operates under the control of the Attorney General. The power to manage and control all penal and correctional institutions of the United States is undoubtedly a sizable grant of authority, implicitly authorizing a wide variety of contracting activities. The authority is no weaker because it is implied. This strengthens our conclusion that section 4125, properly construed, impliedly grants authority to the Director of the Bureau of Prisons to contract specifically with respect to the services of federal prisoners.

█ Defendant attempts to refute this conclusion by arguing that contracts binding the Government to provide inmate labor cannot be valid because such contracts violate public policy. Defendant's theory is that long-term commitments about inmate labor involve an impermissible constraint on the Federal Government's exercise of its analogue of "police power." We, however, see no abdication of responsibility here, nor can we agree that the Government's promise violated public policy. The statute in dispute places no time limits on the arrangements which may be made, instead authorizing the provision of inmate labor "under terms, conditions, and rates mutually agreed upon." This language reflects a congressional judgment that the Attorney General (and through him, the Director of the Bureau of Prisons) should have discretion to determine the appropriate terms upon which to make available the services of federal prison inmates. We do not see that this discretion was abused, for at the times the agreement and modification were signed, the Director evidently saw sufficient rehabilitative potential for the inmates in the work planned for Swift Trail that he determined it would be appropriate to promise a supply of inmates sufficient to insure "satisfactory progress of the contemplated work." Indeed, the 1958 agreement recited that work on the Swift Trail project "offers particular advantages for the rehabilitation of men convicted for violation of Federal law."

Furthermore, the Director of the Bureau of Prisons was careful not to relinquish all control over the administration of prisoners on the Swift Trail project. The agreement left the Director with full control over which prisoners should be assigned to the project, subject to the promise that "turnover of assigned prisoners will be kept to a minimum." The Director also retained discretion, with the Bureau of Public Roads, to determine the precise number of prisoners to be assigned to the project. It is true that the Government promised that "every effort" would be made to insure the number was adequate, and, as we will see, this promise is critical to the case, but the promises made by the Bureau of Prisons cannot be said to involve a violation of public policies nor can the statute's grant of authority to contract be denied.

We must next consider whether defendant intended to exercise the authority to contract that it had. Defendant has not denied that it did, taking the view that lack of authority to contract was the defect in plaintiff's contract claim. Nonetheless, we now turn to an examination of the 1958 agreement to see what use was made of this authority. That document reads in part, as follows:

II. The number of prisoners to be made available for the road work, exclusive of the number of prisoners required for the maintenance of the camp or camps, will be by agreement between the Prisons Bureau and Public Roads but the selection of individual prisoners shall be made exclusively by the Prisons Bureau. However, *every effort will be made to provide an adequate number of prisoners to insure satisfactory progress of the contemplated construction work* and the turnover of assigned prisoners will be kept to a minimum.

The conduct of the prisoners will at all times be under the direct control of the Federal prison employees. Work assignments and instructions will be issued by the County construction superintendent in coordinating the performance of the prison labor work with the operation of the County equipment, and in carrying out the overall directions of the resident engineer. As promptly as possible after execution of this agreement, and by arrangement with the United States Forest Service, the Prisons Bureau will construct, equip, maintain and operate a camp or camps for the Federal prisoners, their guards and other necessary administrative personnel. All expenses in connection with maintaining and operating the prison camp, including the transportation of prisoners and their guards to and from the construction site, shall be borne by the Prisons Bureau without cost either to Public Roads, the Forest Service, the State, or the County. [Emphasis supplied.]

The most important language in the provisions just quoted is, obviously, defendant's assurance that "every effort will be made to provide an adequate number of prisoners to insure satisfactory progress of the contemplated construction work." If intended as a promise, this provision supports plaintiff's claim. But there has been almost no discussion of how the parties intended the 1958 agreement and the 1960 modification to be construed. Concededly, neither was labeled a "contract." Instead, the 1958 document was entitled, "Agreement for Cooperative Construction * * *." Its first paragraph indicated that the parties regarded it both as an agreement and as a memorandum of understanding; its structure and language indicate that some of the agreements made there were intended to be binding while other matters were left open for later administrative determination. The document stated:

It Is Further Understood and Agreed:

I. That the foregoing provisions are firm commitments on the part of the parties hereto to the extent that administrative action can be taken at this time and as to future operations, they shall be construed as an expression of intent to take all appropriate steps to carry out the cooperative undertaking in the public interest in providing a progressive work program to accomplish the construction of the highway in an efficient and economical manner and to provide for the rehabilitation of Federal prisoners who show promise of improvement through training and engaging in productive work to the end that they may become useful citizens.

II. This agreement shall be considered as a Memorandum of Understanding where any indicated commitments are dependent upon an appropriation by the Congress of necessary Federal funds, or that may require separate and additional administrative action that cannot be taken at this time.

 As stated above, defendant left itself discretion with regard to the number of prisoners to be supplied and the specific ones to be employed. But there was no hedge in the statement that every effort would be made to provide an adequate in-

mate work force for satisfactory progress of the construction. It is fundamental that the key to interpretation of an agreement is ascertainment of the intent of the parties. It cannot reasonably be suggested that plaintiff was expected to make the investment in time,[5] effort, and money that it did, for a joint project involving a road in a *national forest,* without having the security of meaningful promises by those who shared the project's goals. The principal purpose of the agreement was to insure that all parties would see the project through to its end. This purpose weighs heavily in our interpretation of the agreement. *See* Restatement (Second) of Contracts § 228(1) (Tent. Drafts Nos. 1–7, 1973). We must conclude that defendant intended to promise that it would continue to supply prisoners until the project's completion.[6] That promise was authorized, as we have said, because the prisoners were to be provided to federal departments, and plaintiff, as a party to the agreement, was entitled to rely upon it. Thus, defendant had a contractual duty to plaintiff to make "every effort * * * to provide an adequate number of prisoners to insure satisfactory progress of the contemplated construction work."

This view we think is reinforced by language in the agreement to which plaintiff and the several agencies and departments of the Federal Government were parties, each committing itself to discharge certain responsibilities, some of which have heretofore been stated. The obligations undertaken by this agreement run to each party thereto. The Bureau of Public Roads undertook "to maintain a well balanced construction operation until completion of the project" subject only to availability of the necessary appropriations. The Forest Service agreed that it would cooperate "with a view to providing continuous construction

operations on the project until its completion." The state expressed its intention to recommend a continuous and uninterrupted annual program "until construction of this project has been completed." These commitments in the agreement are very helpful in interpreting the intent of the parties and the language of the Bureau of Prisons that "every effort will be made to provide an adequate number of prisoners to insure satisfactory progress of the contemplated construction work." Construing the agreement as a whole, and considering that it was operative for almost 15 years, leaves no doubt but that defendant considered it had authority to agree with, and to be bound by, the unambiguous language of these commitments. We follow the established general rules that provisions of a contract must be so construed as to effectuate its spirit and purpose, that it must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions, and that an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result. *ITT Arctic Serv. Inc. v. United States,* 524 F.2d 680, 683, 207 Ct.Cl. 743, 751 (1975); *Northwest Marine Iron Works v. United States,* 493 F.2d 652, 657, 203 Ct.Cl. 629, 637 (1974). The parties' contemporaneous construction of an agreement, before it has become the subject of dispute, is of course entitled to great weight in its interpretation. *Petrofsky v. United States,* 488 F.2d 1394, 203 Ct.Cl. 347 (1973).

### III

We must turn next to determine whether the promise has been breached. We acknowledge the paucity of evi-

---

**5.** Construction work was roughly 45 percent complete when work was halted after 14½ years of work.

**6.** Defendant's promise specifies no time period during which defendant is to be held to its obligation to provide prisoners. The references to "satisfactory progress of the contemplated

construction work" and to the lack of funds necessary to engage alternative labor sources can reasonably be read, in the context of the whole agreement, only to mean that prisoners were to be supplied as long as they remained necessary to complete the construction work originally contemplated.

dence concerning the efforts made by defendant to avoid withdrawal of the prison labor from the project. We note too that the risk of nonpersuasion on this issue, as on the others, is with plaintiff. But we cannot overlook the fact that evidence about defendant's efforts is within the exclusive control of defendant. Defendant has not argued that the promise in the agreement was carried out, but merely that there was no authority for the promise, a proposition we have rejected. The reasons cited by the Director of the Bureau of Prisons for his decision to withdraw the inmates indicate a discretionary, not a compelled, decision. Prison labor played an integral role in the Swift Trail construction project for almost 15 years before it was suddenly withdrawn, yet we see no evidence of efforts by defendant to deal with concern about inmate injuries (and liability therefor) and the availability of alternative work assignments by measures short of withdrawing all the inmates from the project. Such a withdrawal was rightful only if "every effort" had been made to leave an adequate number of inmates on the project.[7] We do not believe such efforts were made. Such evidence as we have, and the posture of the parties on this issue, compels a finding that defendant breached its promise.

As further evidence of defendant's breach of promise, plaintiff's petition cites defendant's alleged failure to follow the dictates of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, in terminating the use of inmate labor on the project. That statute, enacted in 1970, requires certain major federal actions significantly affecting the quality of the human environment to be preceded by a study, and in many cases a report, giving substantial attention to concerns of environmental quality. Plaintiff's petition alleges that the abandonment of the unfinished road project had a sufficient environmental impact to

require that defendant do more than it did to consider the environment before it could withdraw from the project. But some environmental studies were made before the decision to withdraw was made, although a full-scale environmental impact statement about construction alternatives was not completed until November 1976. Such a detailed impact statement is not required for all federal actions affecting the environment, and neither the applicability of N.E. P.A. to these facts nor defendant's compliance or noncompliance with the statute can be determined on these motions for summary judgment. We note that plaintiff, having invoked the statute in its petition, mentioned it no further, either in briefs or at oral argument. We conclude that plaintiff does not rely on this statute to establish its entitlement to summary judgment, and we treat the subject no further. But, we have already said that plaintiff has proved both a contract and a breach.

### IV

Having concluded that defendant breached its contractual duty to plaintiff, we turn finally to the question of damages. Ordinarily, a party injured by the breach of a contract is entitled to be placed in the position he would have been had the promised performance been carried out, but we have said that restitution, "making plaintiff whole," may also be appropriate. *See Acme Process Equip. Co. v. United States,* 347 F.2d 509, 528, 171 Ct.Cl. 324, 356 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). Plaintiff thus seeks a judgment for the amount spent by it in performing the contract, but limits its claim to funds associated with work done within the borders of the national forest on segments which are not presently used by the public. Plaintiff abjures recovery for expenses incurred both on part of the road located outside the forest and in maintaining the unimproved segment of

---

7. We can imagine situations in which the provision of inmate labor would have been impossible. To take an extreme hypothetical, if the President pardoned all federal prisoners, none would be available for work on Swift Trail. This would relieve the Bureau of Prisons of liability for breach of the contract, for efforts to provide prisoners would be futile. Whether a claim of frustration could be made out is another matter, not before us.

Swift Trail. Restitutionary recovery is limited to the reasonable value of the injured party's performance, measured as of the time it was rendered, less the amount of benefits conferred upon plaintiff by the part performance of the breaching party. Restatement of Contracts § 347. Proceedings before a trial judge are necessary to determine the amount to which plaintiff is entitled.

Since we conclude plaintiff may recover on the claim stated in count I of the petition, we have no need for further reference to the arguments advanced by the parties with regard to counts II, III, and IV.

Defendant's motion for summary judgment is denied, plaintiff's cross-motion for summary judgment is granted on the issue of liability, judgment is entered for plaintiff and the case is remanded to the trial judge for appropriate proceedings to find the damages to which plaintiff is entitled pursuant to this opinion.