## STANDARD OIL COMPANY OF CALIFORNIA

v.

### The UNITED STATES.

### No. 208–77.

United States Court of Claims.

July 28, 1982.

Robert M. Westberg, San Francisco, Cal., attorney of record, for plaintiff. Thomas E. Haven, Pamela Phillips, and Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel.

Andrew F. Walch, Washington, D. C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D. C., for defendant. Larry R. Rowe, Dept. of Energy, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and NICHOLS and BENNETT, Judges.*

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT III

FRIEDMAN, Chief Judge:

The petition in this suit by Standard Oil Company of California ("Standard") contains four counts. Each count alleges a breach by the United States of a different provision of a complex 1944 contract that governs the production of oil from the Elk Hills Naval Petroleum Reserve in California. The dispute relates to the amount of oil the contract entitled Standard to receive from the production of the Reserve. Standard moved for summary judgment on the first three counts, and the defendant cross-moved on count I.

On June 30, 1982, we granted summary judgment for Standard on counts I and II, —— Ct.Cl. ——. We stated that our decision on count III would be the subject of a subsequent opinion. This opinion deals solely with count III. We hold that Standard cannot recover on that count, and we dismiss it.

### I.

In our previous opinion, we described at length the background of the contract (known as the "Unit Plan Contract"), the negotiations leading to it, its principal provisions, and the legislation that authorized its execution. We shall not repeat that discussion here but merely shall summarize so much of it as is necessary to an understanding of this aspect of the case.

In 1912, the President placed a significant portion of the public lands containing oil in the Naval Petroleum Reserve No. 1, Elk Hills, California (the "Reserve"). This land was to be held for the exclusive benefit of the Navy. In the Naval Appropriations Act of 1920, Pub.L.No.66–243, 41 Stat. 812, 813 (codified as amended at 10 U.S.C. § 7426(a) (1976)), Congress directed the Secretary of

---

* This case originally was argued before and submitted to a panel consisting of Chief Judge Friedman and Judges Kunzig and Bennett. Af- ter Judge Kunzig died, count III of the case was resubmitted to the present panel.

the Navy (the "Secretary") to manage the Reserve and authorized him to "conserve, develop, use and operate" it "for the benefit of the United States." The United States did not own or lease all of the lands in the Reserve. By 1942, Standard was the major (if not the only) private owner and lessee in the Reserve. It owned approximately 20 percent of the underlying hydrocarbons.

A problem created by the joint ownership of the Reserve was that wells drilled by Standard might draw oil from under the Navy's land. A 1938 amendment of the 1920 act authorized the Secretary "to contract with the owners and lessees of land within or adjoining" the Reserve "for conservation in the ground of oil and gas." Pub.L.No.75–786, 52 Stat. 1252, 1253. Pursuant to this authority, the Secretary and Standard in 1943 negotiated a tentative agreement to "unitize" the Reserve—*i.e.*, to operate the Reserve as a single unit and to allocate costs and the oil produced on the basis of the parties' respective interests in the underlying petroleum. The agreement, referred to here as the "preliminary Unit Plan Contract," gave the Navy sole control over the time and rate of production from the entire Reserve, and assured that Standard would receive a specified amount of its share of the oil there.

The Attorney General, to whom the Secretary had submitted the preliminary Unit Plan Contract for an opinion of its legality, concluded that since Congress had not considered unitization in enacting the 1938 act, the contract should not be executed without congressional approval. Congress then passed the act of June 17, 1944, Pub.L.No. 78–343, 58 Stat. 280 (amending the 1920 appropriations act). The act authorized the Secretary to enter into "contracts for joint, unit, or other cooperative plans of exploration, prospecting, conservation, development, use and operation of lands owned or controlled by the United States" within the Reserve. It stated that "such use and operation [is] to be for the protection, conservation, maintenance, and testing" of the Reserve or "for the production of petroleum" that the Secretary "finds required for the national defense: *Provided, however,* That

no petroleum shall be produced pursuant to such a finding unless authorized by the Congress by joint resolution."

The act further provided that a party to such a contract could be permitted to receive an amount of oil necessary to compensate it

(a) for its share of the current expenses of protecting, conserving, testing and maintaining in good oil-field condition such lands and the wells and improvements thereon, and its real and personal taxes levied or assessed thereon; and

(b) for surrendering control of the rate of production from its lands * * *.

Two days after the 1944 amendment was passed, Standard and the Navy executed the Unit Plan Contract. Section 2 of the contract provides that Standard and Navy should share in the production from the Reserve according to their respective shares of the petroleum in the Reserve, "subject to the further provisions of this contract."

For the period ending August 1950 (called the "primary period" in the contract), section 5(d) of the contract entitled Standard to receive initially 25 million barrels (later increased to approximately 28 million barrels) of its share of oil in one of three zones in the Reserve, or one-third of its share of recoverable oil in the zone, whichever was less. After the primary period, section 5(f) of the contract entitles Standard to receive a daily quantity of oil, the value of which is equal to Standard's share of "the current expenses of protecting, conserving, testing, and maintaining the Reserve in good oil-field condition" plus the taxes assessed against Standard's land and equipment in the Reserve.

The oil Standard receives under section 5(f), like that it received under section 5(d), is to be counted against Standard's percentage participation. In other words, sections 5(d) and 5(f) of the Unit Plan Contract do not entitle Standard to receive any of the Navy's oil but only to receive its own oil in the Reserve sooner than it otherwise would under the other provisions of the contract.

## II.

Count III of the petition involves section 5(g) of the Unit Plan Contract. That section provides that if, after the primary period (*i.e.*, beginning in 1950), Navy permits production of oil from a zone of the Reserve in an amount that exceeds the amount to which Standard is entitled under section 5(f) (*i.e.*, an amount equalling Standard's share of the current expenses of protecting, conserving, testing and maintaining the Reserve plus Standard's taxes on the Reserve) and if Standard has received a percentage of the total production (up to that time) from that zone of the Reserve greater than its percentage of ownership of the total estimated oil in that zone, Standard will receive only one-third of what it otherwise would receive if Reserve production were allocated according to the respective percentage ownership of oil in that zone of the Reserve by Standard and Navy (*i.e.*, their "percentage participation"). The reduced allotment continues until the total respective amounts of oil Standard and Navy have received are in balance, *i.e.*, each has received a percentage of total production from the zone equal to its percentage participation in that zone. After that point, section 5(g) provides that current production will be allocated according to their respective percentage participations.

Between the effective date of the contract in 1944 and the end of the primary period in 1950, Standard, which owned approximately one-third of the known, exploitable crude oil in the Shallow Oil Zone, had received 28 million barrels of oil from that zone (hereafter referred to as "the Reserve" for convenience) while the Navy had received only about 13 million.

Since Standard had received approximately 68 percent of the total production from the Reserve, which was more than twice the amount it would have received based upon its one-third interest in the Reserve, Standard and Navy were out of balance. As a result, beginning in 1950, the Navy determined Standard's allotment of oil in accordance with section 5(g), so that Standard received only one-third of what it would have received had its allotment been based upon its percentage participation.

Standard acquiesced in this practice until 1967. In that year, its counsel developed a "new idea which questioned whether 5(g) was applicable at all in the * * * circumstances" then prevailing. Standard then, for the first time, disputed the correctness of applying section 5(g) to determine Standard's oil allotment. Standard has continued to challenge the applicability of section 5(g) since that time.

Standard's position is that section 5(g) applies only to production that the Secretary finds necessary for national defense and that has been authorized by a joint resolution of Congress. After 1950, there was no relevant joint resolution until 1976. All oil was produced until 1976 solely to protect, conserve, maintain and test the Reserve. Standard asserts that section 5(g) therefore was used improperly to allocate that production.

Despite Standard's objection to the use of section 5(g) to allocate the oil, the Navy has continued to use the section since 1967. In count III Standard seeks as damages the difference between the value of (1) the oil it would have received had its allotment not been determined under section 5(g), and (2) the oil it actually received under that section.

## III.

Standard's principal argument on this part of the case is that the government is collaterally estopped from litigating this issue because of a district court finding in prior litigation the United States brought against Standard involving another dispute under the Unit Plan Contract. In that case, *United States v. Standard Oil Co.*, No. 47940 (N.D.Cal., May 22, 1972), *affirmed in part and reversed in part*, 545 F.2d 624 (9th Cir. 1976) (the "*Asphalto*" case), the United States sued Standard for a declaratory judgment that under the Unit Plan Contract certain land should be included within the Reserve and for the recovery of amounts Navy paid to Standard that allegedly were overpayments of Navy's share

of the costs of operating the Reserve. The district court held for Standard on all issues. The court of appeals reversed on the lands claim but affirmed the costs claim on a different theory from that of the district court.

The district court adopted without change as its findings of fact and conclusions of law Standard's 75 proposed findings of fact and 19 conclusions of law. Finding 57, which related to one of the cost claims, stated in part as follows:

> Section 5(g) applies only if there is "elective production," i.e., production authorized by a joint resolution of Congress. There was no such elected production here involved.

In affirming the district court on the costs issue, the court of appeals found it unnecessary to reach the merits of those claims. Instead it held that the Navy was bound by an earlier ruling of the Comptroller General in favor of Standard and against the government on the same issues litigated in the *Asphalto* case. 545 F.2d at 636–38.

Standard urges that under *Markoff v. New York Life Insurance Co.*, 369 F.Supp. 308 (D.Nev.1973), *aff'd*, 530 F.2d 841 (9th Cir. 1976), finding 57 in the *Asphalto* case should be treated as collaterally estopping the government from here litigating the question whether section 5(g) applies only to production authorized by a joint congressional resolution. *Markoff* was a diversity case in which the federal district court was required to determine the effect under Nevada law of a state trial court's finding that constituted one of two alternative grounds of the trial court's decision. The Nevada Supreme Court had affirmed the trial court's decision on the other ground without mentioning the finding at issue in *Markoff*.

The district court in *Markoff*, ruling that there were no Nevada decisions in point, applied "the California position," which it described as follows: "[E]ven if the appellate court refrains from considering one of the grounds upon which the decision below rests, an affirmance of the decision extends legal effect to the whole of the lower court's determination, with attendant collateral estoppel effect." 369 F.Supp. at 314. The court of appeals affirmed, stating that: "We believe that this is a sound application of the doctrine of collateral estoppel." 530 F.2d at 842.

Whatever may be the scope of the court of appeals decision in *Markoff*—whether it involves only the application of the Nevada law of collateral estoppel or also reflects the Ninth Circuit's own view of that doctrine—that is not the law of collateral estoppel in this court. In *Hannahville Indian Community v. United States*, 180 Ct.Cl. 477 (1967), the question was whether a finding of fact of the Indian Claims Commission in an earlier case adverse to the plaintiffs barred the plaintiffs from litigating before this court the question the finding covered. This court had affirmed the Commission's earlier decision in which it made the challenged finding, but on a different ground from the Commission's. The court, therefore, had not considered or discussed the disputed finding.

In a subsequent phase of the case, the Commission concluded that "because its finding on the political structure question was not disturbed on appeal, appellants are estopped from relitigating the question in these proceedings." 180 Ct.Cl. at 485. This court, in an opinion by Justice Reed, sitting by designation, reversed that ruling. The court explained:

> [A]ccording to the great weight of judicial and scholarly opinion, when a lower court's decision on a question of fact is challenged in a proper appeal, and the appellate court does not pass upon that finding of fact in reaching its decision, the lower court's finding is not conclusive against the appellant in a subsequent suit on a different cause of action. [Citations omitted.] The doctrine of res judicata must be so limited since a factual issue cannot, consistent with the statutory right to appellate review, be said to have been finally adjudicated when the appellant has been precluded from obtaining the appellate review which he sought and to which he would have been entitled if

the fact had been material. Because this court did not pass upon the Commission's Western Lands determination of the political structure question, we hold that the Commission's determination cannot serve as a bar to relitigation of that issue in these proceedings.

*Id.*

The decision in *Hannahville* speaks in terms of the collateral effect given to findings of fact, while finding 57 in *Asphalto* addresses a question of law, since it interprets a provision of the Unit Plan Contract. That difference is immaterial.

First, *Hannahville* spoke to a factual determination because that was the only issue before the court. No negative implication can be drawn from the decision's silence as to conclusions of law.

Second, the authorities the court cites in *Hannahville*, which applied the same principle as that case, do not distinguish between findings of fact and conclusions of law. *See International Refugee Organization v. Republic S. S. Corp.*, 189 F.2d 858 (4th Cir. 1951) (involving an "issue" of fraud); *Moran Towing & Transportation Co. v. Navigazione Libera Triestina, S.A.*, 92 F.2d 37 (2d Cir.) (involving "grounds for the judgment"), *cert. denied*, 302 U.S. 744, 58 S.Ct. 145, 82 L.Ed. 575 (1937); *St. Joseph Union Depot Co. v. Chicago, R. I. & P. Ry.*, 89 F. 648 (8th Cir. 1898) (speaking in general terms of "issues"), *cert. denied*, 172 U.S. 649, 19 S.Ct. 883, 43 L.Ed. 1184 (1899); 1B J. Moore, Moore's Federal Practice ¶ 0.416[2] (1965) (discussed in terms of "grounds").

For example, Professor Scott, commenting on the original Restatement of Judgments for which he was co-reporter, described the general principle enunciated in *Hannahville* in terms of a difference in the "grounds" of the decisions by the trial and reviewing courts. Scott, *Collateral Estoppel by Judgment*, 56 Harv.L.Rev. 1, 15 (1942). He then states that the principle is applicable not only "to matters of law but also . . . to matters of fact in so far as matters of fact may be determined by the appellate court." *Id.* Although he was de-

scribing the position of the original Restatement of Judgments, the position has not changed in the Restatement Second. *See* Restatement (Second) of Judgments § 27 comment o (1980) (speaking in terms of "determinations of issues" of the trial and appellate courts).

Finally, in terms of the policy upon which *Hannahville* rests, there is no reason to distinguish between findings of fact and conclusions of law. In either situation, the "issue cannot . . . be said to have been finally adjudicated when the appellant has been precluded from obtaining the appellate review which he sought and to which he would have been entitled if the [issue] had been material." 180 Ct.Cl. at 485.

Accordingly, we hold that finding 57 in the *Asphalto* case does not collaterally estop the United States from litigating in this case the question whether section 5(g) applies only to production of oil pursuant to a joint resolution of Congress.

## IV.

■ Standard's claim is based upon the interrelationship between section 5(g) and Recital 8 of the Unit Plan Contract. Recital 8 reads as follows:

(8) It is expressly recognized by Navy and Standard that this contract does not and cannot, in and of itself, authorize the production of any of Navy's share of the oil, gas, natural gasoline and associated hydrocarbons in the Reserve, as distinct from that portion of Standard's share hereinafter permitted to be produced and received by Standard under the terms of paragraphs (d) and (f) of Section 5. The production of the remainder of Standard's share and of all of Navy's share must, except for the purpose of protecting, conserving, maintaining, or testing the Reserve, be preceded by and based upon an authorization by joint resolution of the Congress as provided in the Act of June 4, 1920, as amended; and references hereinafter to an authorization or election by Navy to order the production of any such oil are intended to be limited to

action by the Navy within the terms of any such joint resolution. The production of that portion of Standard's share hereinafter permitted to be produced and charged to its account under paragraphs (d) and (f) of Section 5, including the oil so produced and charged from November 20, 1942 to the date of this contract, is authorized under the provision of the Act of June 4, 1920, as amended, directing the use and operation of the Reserve for its protection, conservation, maintenance and testing; and the production and receipt of such portion by Standard is intended to, and does in fact, represent a consideration moving to Standard under the contract for its agreement hereinafter to relinquish to Navy the control over the time and rate of production from its lands. (See H.R.Report No. 1529, 78th Congress, 2d Session.)

Standard relies on the words "references hereinafter to an authorization or election by Navy to order the production of any of such oil are intended to be limited to action by the Navy within the terms of any such joint [congressional] resolution." It points out that section 5(g) makes the one-third allocation provisions applicable after the primary period only if "Navy shall elect to permit production from the Reserve in excess of the production which Standard may then be receiving" under section 5(f). It argues that under Recital 8 the word "elect" in section 5(f) means an election pursuant to a joint resolution of Congress, which there had not been during the period involved in this claim.

The proper analysis of these provisions and their interrelationship is not as simple as Standard indicates. The statement in Recital 8 (that references in the contract to authorization or election by Navy to order production of oil are limited to action pursuant to a joint congressional resolution) covers only production of any "such" oil. "Such" refers back to the first clause of the sentence, which deals with "the remainder of Standard's share" and with "all of Navy's share" which, "except for the purpose of protecting, conserving, maintaining or testing the Reserve," may be produced

only pursuant to congressional resolution. The "remainder" of Standard's share is the oil other than that covered by the first sentence of Recital 8. The first sentence deals with the portion of Standard's share "permitted to be produced and received by Standard under the terms of" sections 5(d) and 5(f).

Section 5(d) permits Standard to receive during the primary period 15,000 barrels per day of oil produced from the Shallow Oil Zone, which amount the Secretary may reduce "provided that he is not then causing petroleum to be produced pursuant to joint resolution of Congress." Section 5(f) entitles Standard, if the Navy "shall elect (see paragraph (8) of the Recitals)" to suspend or reduce production from the Reserve, to receive an amount of oil the value of which equals Standard's "share of the current expenses of protecting, conserving, testing and maintaining the Reserve in good oilfield condition" plus Standard's taxes on the Reserve. Section 5(f) further provides that if at any time the amount of oil Standard has received exceeds one-third of "Standard's share of the estimated recoverable oil," Standard will not be entitled to receive any further production under that paragraph.

Read together, these various provisions of Recital 8 and sections 5(d) and 5(f) show that the reference in Recital 8 to Navy's "elect[ion] to order the production of any such oil" is limited to production pursuant to a joint congressional resolution. The production to which the "authorization or election" clause applies is production other than that necessary "for the purpose of protecting, conserving, maintaining or testing the Reserve." This protective production includes the oil necessary to meet Standard's entitlement under sections 5(d) and 5(f).

Section 5(g), on the other hand, speaks in terms of the Navy's election of Reserve production in excess of that Standard is receiving under section 5(f). The parties must have realized in 1944 that the total production required to "conserve, protect,

maintain and test" the Reserve could exceed the production to which Standard would be entitled under section 5(f) (as actual production apparently did from 1950 through 1976). The "election" of production to which section 5(g) refers is not the election of "such" production that Recital 8 covers, *i.e.*, it is not limited to production pursuant to a joint congressional resolution. Recital 8 by its own terms does not define election as used in section 5(g).

This conclusion is consistent with and supported by the legislative history of the 1944 act, which authorized the Unit Plan Contract. Recital 8 was added to the Unit Plan Contract after the 1944 legislation was enacted. Recital 8 apparently was added to clarify the contract in accordance with the concerns that Congress had voiced during consideration of the 1944 act. One indication of this is the Recital's citation of the House Committee Report on the 1944 act (*see supra,* pp. 1342–1343)—an unusual feature of a contract recital.

A major objective of the 1944 legislation was to clarify the circumstances under which the Navy could authorize production from the Reserve. *See* H.R.Rep.No.1529, 78th Cong., 2d Sess. 6–7 (1944). The Naval Appropriations Act of June 4, 1920, 41 Stat. at 813, had authorized the Secretary

> to conserve, develop, use and operate [the naval reserves] in his discretion, directly or by contract, lease or otherwise, and to use, store, exchange, or sell the oil and gas products thereof, and those from all royalty oil from lands in the naval reserves, for the benefit of the United States.

It was uncertain, however, whether the Secretary could authorize production for purposes other than the conservation and development of the Reserve that the 1920 act expressly sanctioned. The 1944 act was designed to make explicit that except for protective purposes (which Congress sanctioned by the authority to produce to conserve, protect, maintain or test the Reserve), any other production from the Reserve was to be pursuant to joint congressional resolution.

Recital 8 was added to the Unit Plan Contract after the 1944 act was passed, to implement and make explicit that congressional purpose. All of the provisions of Recital 8, including the "such oil" provision upon which Standard relies, are designed to accomplish that objective. Although Recital 8 may be more detailed than was necessary to accomplish the purpose, it cannot fairly be read as implicitly modifying section 5(g) to limit the applicability of the oil allocation formula there provided to production pursuant to joint congressional resolution.

The only item in the legislative history touching directly on this question shows that Congress was informed that after the primary period ended, section 5(g) would apply to allocate Reserve production. In a written response to a set of questions submitted by Representative Carl Vinson, Chairman of the House Committee on Naval Affairs ("Memorandum of Comments in Reply to Chairman Vinson's Letter of February 5, 1944," at pp. 2–3), R. Keith Kane, Special Assistant to the Secretary of the Navy, explained the operation of section 5(g) as follows:

> At the close of the primary period it is probable that Standard will be ahead of Navy in the respective takings of oil from the Shallow Zone. Accordingly, and for the purpose of redressing the balance, any subsequent production from the Shallow Zone will be currently allocated as follows: Navy will take that amount equivalent to its then percentage participation, and, in addition, it will take ⅔ of that amount which is equivalent to Standard's then percentage participation. (Section 5(g)). Standard, in other words, will take only ⅓ of its share until such time as the total absolute amounts of production received by each party from the Shallow Zone since November 20, 1942 are in balance with their respective percentage participations in that zone.

There is no indication that Mr. Kane believed that the production section 5(g) covered was limited to production pursuant to joint congressional resolution. Indeed, Mr.

Kane stated that the allocation formula in section 5(g) would govern "any" production after the primary period. At that time, Standard did not object to this description of section 5(g).

When Congress considered the Unit Plan Contract in enacting the 1944 amendment, it understood and intended that after the primary period section 5(g) of the contract would govern production whenever Standard and Navy were out of balance. In limiting the Secretary's authority to authorize production for nonprotective purposes to production pursuant to a joint congressional resolution, there is no indication that Congress intended to narrow the scope of section 5(g) to production pursuant to such resolution. No change was made in section 5(g) from the preliminary Unit Plan Contract to the final Unit Plan Contract that the parties executed after Congress had authorized it.

If the parties to the final contract had intended Recital 8 to make such a significant change in section 5(g) as Standard now argues it made, presumably they would have stated so expressly or at least reflected that intent in some contemporaneous record. They did neither.

The parties' subsequent conduct confirms that they understood and intended that section 5(g) would apply as the government consistently has interpreted it. For the first 17 years after the primary period, Standard acquiesced in the government's interpretation. It did not object when the government used section 5(g) to determine Standard's allocation between 1950 and 1967, even though during that period the oil involved was not produced pursuant to joint congressional resolution.

This long-standing interpretation by the parties to the contract is entitled to substantial weight. Cf. *United States v. Atlantic Refining Co.*, 360 U.S. 19, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959). "The parties' contemporaneous construction of an agreement, before it has become the subject of dispute, is ... entitled to great weight in its interpretation." *Arizona v. United States*, 216 Ct.Cl. 221, 236, 575 F.2d 855, 863

(1978). Although the parties' interpretation of section 5(g) from 1950 to 1967 was not "contemporaneous" with the execution of the contract in 1944, it was far closer to the execution than the new interpretation which Standard first offered in 1967, 23 years after the contract was entered into.

Standard points to a statement in a December 1976 letter from Acting Secretary of the Navy Bennett which, according to Standard, reflects the Navy's agreement with Standard's present position. In that letter, which discussed negotiations between Standard and the Navy over the proper resolution of another disagreement under the Unit Plan Contract, Acting Secretary Bennett stated that under the *Asphalto* decision, section 5(g) would be "operable only during those periods of time when the Reserve is producing pursuant to a Congressional mandate."

As Standard recognizes, however, at the time Acting Secretary Bennett made that statement, production of the Reserve was taking place pursuant to a congressional joint resolution (*see supra,* p. 1340). There is no dispute that section 5(g) applies in that situation. The Acting Secretary's view, however, sheds no light on the question in this case, which is whether section 5(g) applies only to such production.

Standard provides no policy considerations, convincing or otherwise, to support its interpretation of section 5(g). On the other hand, the government's interpretation has cogent policy justification. A major objective of the Unit Plan Contract was to bring Standard and Navy into balance after the primary period had ended. This was to be accomplished by limiting the oil Standard would receive until the imbalance had been rectified. The interpretation the parties gave to section 5(g) from 1950 to 1967 would further this objective, since it would correct the imbalance far sooner than if correction had to await production from the Reserve pursuant to joint congressional resolution.

We therefore conclude that the government correctly applied section 5(g) to reduce Standard's allotment of oil that was

not produced pursuant to a joint resolution of Congress. The plaintiff accordingly is not entitled to recover on count III of the petition.

■ As noted earlier, although Standard moved for summary judgment on count III, the defendant did not cross-move. Where, however, as here, there is no dispute over relevant material facts and where judgment is appropriate as a matter of law, the court, *sua sponte*, may enter summary judgment for a nonmoving party. *See Local 33, International Hod Carriers Union v. Mason Tenders District Council*, 291 F.2d 496, 505 (2d Cir. 1961); *United States v. Cless*, 150 F.Supp. 687, 692 (M.D.Pa.1957), *aff'd*, 254 F.2d 590 (3d Cir. 1958); 6 J. MOORE, W. TAGGART, & J. WICKER, MOORE'S FEDERAL PRACTICE ¶ 56.12 (2d ed. 1982); *cf. Greenway v. United States*, 163 Ct.Cl. 72, 76 (1963) (indicating that the court may enter summary judgment in the absence of a cross-motion when trial would be "academic").

### CONCLUSION

Summary judgment is entered for the defendant on count III of the petition. That count is dismissed.