# United States Court of Appeals for the Federal Circuit

05-1512

CITIES OF BURBANK, GLENDALE and PASADENA, CALIFORNIA,

Appellants,

v.

Samuel W. Bodman, SECRETARY OF ENERGY,

Appellee.

John P. Williams, Duncan & Allen, of Washington, DC, argued for appellants. With him on the brief was Helene de Neuville Pangas. Of counsel on the brief were Dennis A. Barlow, City Attorney and Terry B. Stevenson, Senior Assistant City Attorney, for the City of Burbank, California; Scott H. Howard, City Attorney and Steven G. Lins, Senior Assistant City Attorney, for the City of Glendale, California; and Michele Beal Bagneris, City Attorney and Scott D. Rasmussen, Assistant City Attorney, for the City of Pasadena, California.

Kenneth M. Dintzer, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General and David M. Cohen, Director.

Appealed from:    United States Department of Energy Board of Contract Appeals

Acting Chief Administrative Judge Beryl S. Gilmore

# United States Court of Appeals for the Federal Circuit

05-1512

CITIES OF BURBANK, GLENDALE and PASADENA, CALIFORNIA,

Appellants,

v.

Samuel W. Bodman, SECRETARY OF ENERGY,

Appellee.

_____

DECIDED:  August 30, 2006
_____

Before NEWMAN, RADER, and GAJARSA, Circuit Judges.

RADER, Circuit Judge.

The Department of Energy Board of Contract Appeals (Board) denied claims by the cities of Burbank, Glendale, and Pasadena, California (the Cities) asserting that the Bonneville Power Administration (BPA) miscalculated the rate it charged them for power under various contracts.  Cities of Burbank, Glendale, & Pasadena, Cal., EBCA Nos. C-030364-66, slip op. (Apr. 14, 2005) (Board Decision).  Because the Board correctly interpreted the disputed contractual provision, this court affirms.

I.

BPA, an executive agency within the United States Department of Energy, see 16 U.S.C. § 832a (2000), markets, sells, and exchanges government-generated power within and beyond the Pacific Northwest. See 26 U.S.C. § 837(b) (2000) (defining "Pacific Northwest").  To ensure a preference for power needs in the Pacific Northwest, title 16 places restrictions on customers beyond that region.  See, e.g., 16 U.S.C.

§ 837b (entitled "Contract terms and conditions for use of electric energy outside the Pacific Northwest"). The Cities contracted with BPA in 1988 to purchase power, referred to in the Agreements as "surplus firm power," for a period of twenty years. Board Decision, slip op. at 2. Thus, while each of the Cities entered into its own contract with BPA, those contracts (Nos. DE-MS79-87BP92411, -92412, and -92413) (the Agreements) each contained an identical provision to ensure that the Cities paid rates in excess of the charges for local BPA customers. Those provisions used the rates paid by local customers, the "Priority Firm Power Rate[s]," as a guideline for adjusting the Cities' higher rates during the life of the Agreements.

During the first five years, the Agreements fixed the Cities' rates for surplus firm power. Board Decision, slip op. at 2. Those fixed rates began at $4.60/kW-month in 1988, and gradually increased to $5.81/kW-month in 1992. Beyond 1992, Section 9(a)(3) of the Agreements adjusted those rates:

Adjustment Resulting from Adoption of New Priority Firm Power Rate Schedule.

Adjustments under this paragraph begin January 1, 1993. . . . On the effective date of any Bonneville Priority Firm Power (PF) rate adjustment thereafter, the rate for surplus firm power (SLnew) shall be adjusted as follows:

$$SLnew = SLn \times PFnew/PFprev$$

where

SLnew = The effective surplus firm power demand and energy charges hereunder as adjusted to reflect the change between PFnew and PFprev.

SLn = For the initial adjustment under this paragraph 9(a)(3) the SLn demand charge shall be $5.81/kW-mo. and the energy charge shall be 25.88 mills/kWh. For all subsequent adjustments under this paragraph the values for SLn shall be the then-current values for the previous SLnew.

PFnew = The newly adjusted average PF rate or successor rate(s) in mills per kWh. Such average PF rate shall be calculated at a load factor of 50 percent, and assuming a uniform demand in all months. If there is more than one PF rate, the average shall be determined by a weighting based on forecasted sales under such PF rates.

PFprev = The average PF rate or successor rate(s) in mills per kWh, in effect during the previous rate period. Such average PF rate shall be calculated at a load factor of 50 percent, and assuming a uniform demand in all months. If there is more than one PF rate, the average shall be determined by a weighting based on forecasted sales under such PF rates.

Joint Appendix at JA 20074-75. Thus, while the Agreements specify a surplus firm rate for the Cities' power that is higher than the Priority Firm Rate (the PF rate), Section 9(a)(3) adjusts the surplus firm rate based on any yearly adjustments to the PF rate. In other words, when the PF rate increases 5%, the surplus firm rate will also increase 5%, regardless of the difference between the two rates.

Upon adoption of the Agreements, BPA's local customers paid one of two PF rates: the Preference rate and the Exchange rate. Board Decision, slip op. at 3. At the time of the first adjustment, BPA calculated Section 9(a)(3)'s PFnew by determining average Preference and Exchange rates and then weighting those averages by the forecast sales of power in each category. Id. at 3. As it turned out, at the time of the first adjustment in 1993, the Preference and Exchange rates were identical. Previously, the Exchange rate had been higher. As a result of the lowered Exchange rate in 1993, and its role in calculating PFnew and PFprev, the Cities' cost for power under the Agreements decreased after the 1993 adjustment. Id. at 4. In 1995, when BPA next adjusted the rates, the Preference and Exchange rates were again equal. Thus, the Exchange rate again had no effect on the 1995 adjustment. Id.

The dispute in this case arose when BPA altered the structure of its PF rates. Before 1996, BPA's local "Pacific Northwest" customers paid PF rates that included only demand and energy charges under both the Preference and Exchange rates. Joint Appendix at JA 20124 ("Schedule PF-95 Priority Firm Power Rate"). In 1996, BPA broke those rates down in more detail by specifying a demand charge, twelve separate energy charges, a load shaping charge, a load regulation charge, and separate transmission charges. Joint Appendix at JA20137-42 ("SCHEDULE PF-96 PRIORITY FIRM POWER"). Due to that breakdown, which the Board referred to as "unbundling," the new rate schedule still included the heading: "PRIORITY FIRM POWER," followed by demand and energy charges. However, the new rate schedule also included a number of additional headings, e.g. "FULL LOAD SHAPING," "LOAD REGULATION," "TRANSMISSION," etc., each being followed by specified charges. In a letter, BPA explained to the Citites that those various additional charges had previously been bundled into the PF rates. Therefore, BPA would continue to include them in modifications to the rates under Section 9(a)(3) of the Agreements.

The Cities objected. They did not agree to the use of these additional charges when calculating PFnew under Section 9(a)(3) ("the unbundling issue"). The Cities also objected, as they had not done in the past, to BPA's use of the Exchange rate in the Section 9(a)(3) calculation ("the Exchange rate issue").

Initially, the City of Burbank (Burbank) alone brought breach of contract claims against the government in the United States Court of Federal Claims. That court dismissed Burbank's claims on jurisdictional grounds, reasoning that Burbank's claims fell within the exclusive jurisdiction of the United States Court of Appeals for the Ninth

Circuit. City of Burbank v. United States, 47 Fed. Cl. 261, 268 (2000). Burbank appealed and this court reversed. City of Burbank v. United States, 273 F.3d 1370, 1382 (Fed. Cir. 2001). On remand, the Court of Federal Claims again dismissed Burbank's claims for the alternative reason that Burbank did not comply with the Contract Disputes Act. See id. at 1382 ("On remand, the Court of Federal Claims may reinstate its alternative holding dismissing Burbank's claims without prejudice for failure to comply with the requirement of the Contract Disputes Act.").

Following the lead of the Court of Federal Claims' second dismissal, Burbank, joined by the Cities of Glendale and Pasadena, sought reimbursement from the BPA's contracting officer based on BPA's alleged miscalculation under section 9(a)(3). After the contracting officer rejected their claims, the Cities appealed to the Board.

The Board rejected the Cities' arguments. As to the unbundling issue, the Board determined that the PF rates had always included the additional charges. Thus, separate itemization (to local customers) of the various charges was not a sufficient reason to take them out of the Section 9(a)(3) calculation. Board Decision, slip op. at 11-12. The Board explained: "The formula was adopted to track increases or decreases in PF rates, the rates PF customers pay for power. To limit the PF rates in 1996 to only the demand and energy charges would defeat the purpose of the rate adjustment formula." Id., slip op. at 12.

On the Exchange rate issue, the Board reasoned that the Agreements explicitly contemplate an average of multiple PF rates. Id., slip op. at 14. The Board rejected the Cities' arguments as at odds with the language of the contracts. Finally, the Board reasoned that the Cities' failure to challenge the use of the Exchange rate in the 1993

and 1995 adjustments demonstrated the Cities' acceptance of that rate as an appropriate component of any Section 9(a)(3) adjustment.

II.

This court reviews the Board's decision under the provisions of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613 (2000) (the CDA). Under the CDA, this court reviews the Board's conclusions of law without deference. 41 U.S.C. § 609(b); White v. Edsall Constr. Co., 296 F.3d 1081, 1084 (Fed. Cir. 2002). The Board, however, "has considerable experience and expertise in interpreting Government contracts, and its interpretation is given careful consideration and great respect." Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993). This court will not set aside a Board's findings of fact unless "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b); HPI/GSA 3C, LLC v. Perry, 364 F.3d 1327, 1333 (Fed. Cir. 2004).

The Unbundling Issue

"A principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed." Winstar Corp. v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995) (en banc) (quoting Arizona v. United States, 575 F.2d 855, 863 (Ct. Cl. 1978)), aff'd 518 U.S. 839 (1996). Thus, this court seeks the correct interpretation of Section 9(a)(3) consistent with the parties' intent at the time of contract execution in 1988. At that time, the PF rates, whether the Preference rate or the Exchange rate, represented the total rates paid by local customers for BPA power. See Board Decision, slip op. at 4-5. Only later, beginning in 1996, did BPA separately

identify additional charges to the local customers for services previously bundled with the PF rates. Id. Thus, from the outset of the Agreements, Section 9(a)(3) adjusted the Cities' rates based on changes in the specific unbundled charges first separately identified in 1996.

The BPA's 1996 rate schedule recites the term "priority firm power," with its associated charges, and identifies additional new charges. BPA's 1995 rate schedule had not identified those additional charges separately. In one sense, the term "priority firm power" changed in 1996 to exclude the newly identified additional charges that the Citites are now seeking to exclude from the Section 9(a)(3) calculation. In another sense, those additional charges had always influenced changes to the Cities' rates; so nothing changed with BPA's approach. In the most important sense, the meaning of "PF rate" in Section 9(a)(3) did not change eight years into the Agreements due to BPA's unilateral acts. In 1988, the parties understood Section 9(a)(3) to alter the rates charged to the Cities based on the change in the charges to local customers for the same services. The ratio of PFnew/PFprev set forth in Section 9(a)(3) loses its intended meaning unless the PF rates in that ratio represent the same real charges to BPA's local customers from year to year. Thus, the Board correctly concluded that it was proper for BPA, when calculating rates under Section 9(a)(3) to re-bundle the 1996 rates to arrive at a rate comparable to the PF rates paid by local customers in previous years. Any other approach would result in an apples-to-oranges ratio completely disconnected from the parties' intent in the Agreements.

Furthermore, the Cities' theory would give them a windfall in the year BPA first changed its billing practices for local customers, and thereafter would under-calculate

those adjustments. The PF rate for 1995, the year before the unbundling, included two components in its Preference Rate: a Demand Charge of $4.307 per kW during peak periods, and an Energy Charge of either 23.06 (Sept. – Mar.) or 16.94 (Apr. – Aug.) mills per kWh. Meanwhile, in the PF rate for 1996, the Demand Charge dropped to $0.87 per kW, while the Energy Charge stayed substantially the same, though broken down into more than two periods. The record shows that the new charges attributed to load shaping, load regulation, and transmission apparently offset the significant drop in the Demand Charge. Thus, the real numbers confirm the logic of the BPA approach followed by the Board.

Finally, the Cities argue that their cost does not include a transmission rate. Therefore, the Cities protest the use of the transmission rate for local customers when calculating increases under Section 9(a)(3). This reasoning conflates the billing practices to the Cities with the adjustment factor of Section 9(a)(3). As the Board explained, the Agreements locked increases or decreases in the Cities' rates to the same adjustments in local customer rates. Board Decision, slip op. at 12. Thus, while Section 9(a)(3) tracks the actual changes in the cost of power to local customers, it does not require a perfect correlation between the separate components of rates charged to the local customers and the Cities.

The Exchange Rate Issue

The Cities do not dispute that BPA used a blended average of the Exchange rate and the Preference rate when calculating the PF rates for the years before 1996. BPA's use of the Exchange rate in the Section 9(a)(3) calculation during those early years either benefited the Cities, or made no difference. Furthermore, the Cities admit that

the Exchange rate is a PF rate. Appellants' Br. at 40. Nevertheless, the Cities argue that the Agreements are ambiguous and so should be construed in light of extrinsic evidence that they assert supports their position that they never intended to include an Exchange rate in the PF rate calculation. Specifically, the Cities argue that "[i]t was reasonable for the Citites, being from outside BPA's Pacific Northwest region, not to know about the PF Exchange rate unless BPA specifically discussed it with them." Id. Thus, the Cities claim that because they did not know about the Exchange rate, they did not intend its inclusion in Section 9(a)(3).

At the outset, section 9(a)(3) of the Agreements is not ambiguous. Section 9(a)(3) includes definitions of PFnew and PFprev. Both of those definitions include the following sentence: "If there is more than one PF rate, the average shall be determined by a weighting based on forecasted sales under such PF rates." Thus, Section 9(a)(3) contemplates the existence of multiple PF rates and sets forth a procedure for their use in the Section 9(a)(3) calculation.

Moreover, section 9(a)(3) by its own terms did not apply until 1993. Because that section contemplated the possibility of multiple PF rates in the future, the Cities ignorance of the number of PF rates in 1988 is irrelevant. In addition, the Board rejected the Cities' contentions as a matter of fact. The Board explained that the testimony in support of the Cities' theory "is unpersuasive." Board Decision, slip op. at 14-15. In short, this court sees no error in the Board's holding that BPA properly averaged the Exchange rate with the Preference rate when conducting the Section 9(a)(3) calculation.

Finally, the Cities argue that the Board was wrong to support its opinion with the observation that the Cities somehow acquiesced to the use of the Exchange rate by not challenging the use of that rate in earlier years when its use favored the Cities. Any error by the Board in that regard was harmless. The language of the Agreements supports fully the Board's decision.

## CONCLUSION

Because the Board properly interpreted Section 9(a)(3) of the Agreements, this court affirms the denial of the Cities' claims.

## COSTS

Each party shall bear its own costs.

## AFFIRMED