**UNITED FOOD SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 49–88 C.**

United States Claims Court.

Feb. 22, 1990.

William R. Purdy, Jackson, Miss., with whom was Christopher Sollop, for plaintiff.

Martha H. DeGraff, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

RADER, Judge.

On December 21, 1981, plaintiff, United Food Services, Inc. (United Food) entered into a contract with the United States Army (the Army). Plaintiff contracted to provide dining facility attendant services at Fort Bliss, Texas, and at the McGregor, Oro Grande, and Dona Ana Ranges in New Mexico. Plaintiff seeks costs for alleged extra-contractual services.

Both parties moved for summary judgment. After oral argument, this court grants defendant's motion.

## FACTS

United Food promised to provide the Army with dining facility attendant services from January 1, 1982 through June 30, 1986. Plaintiff and the Army executed a fixed-price requirements contract, not a man-hour contract. The contract contained an option clause that allowed annual renewal. Each year the parties extended the contract by signing a modification agreement. The renewal agreements stated:

Except as provided herein, all other terms and conditions remain unchanged and in full force and effect.

Plaintiff's Brief, filed Feb. 21, 1989, Appendix (Pl.App.), at 237, 239. The contract outlined in detail the scope of services provided by United Food.

During performance, plaintiff complained that the Army demanded services not covered by the contract. On March 12, 1984, plaintiff formally wrote to raise these disputes. The parties did not resolve these disputes. Nonetheless, United Food renewed the contract each year. In July 1986, plaintiff submitted ongoing disagreements to the contracting officer as certified claims.

On January 23, 1987, the contracting officer denied four of plaintiff's claims. Plaintiff appealed to the United States Claims Court. The parties now agree that this court can dispose of three of these claims—the resupply of beverages, the cleaning of mermite cans, and the additional work required by Government inspection practices—through summary judgment.[1]

1. Transcript of Proceedings, No. 49-88 C, filed Oct. 18, 1989, (Tr.), at 25.

Plaintiff asserts that material facts remain in dispute regarding the additional serving line in Building 11142.

The contract described plaintiff's duties in some detail. Sections C and E of the contract explicitly set forth performance and inspection requirements. Section C—entitled "Description/Specifications"—listed the work United Food contracted to perform. Section E—"Inspection and Acceptance"—explained the standards for inspection and included a daily evaluation checklist.

The contract also contained an Order of Precedence clause to resolve any inconsistencies in the contract. The Order of Precedence stated:

> In the event of an inconsistency between provisions of this solicitation, the inconsistency shall be resolved by giving precedence in the following order: (a) The Schedule (excluding Specifications); (b) Terms and Conditions of the solicitation, if any; (c) General Provisions; (d) other provisions of the contract, when attached or incorporated by reference; and (e) the Specifications.

Pl.App., Section L, at 131, ¶ C.

*Beverage Resupply*

Section C–5 required plaintiff to supply "the following tasks which are typical but not inclusive." Under the heading "food serving," the contract stated:

> To be performed in accordance with Chapter 14, FM 10–25. Includes pre-service setup and resupply of serving line; carrying food, bulk milk and beverage syrup from storage areas to dispensing equipment; provide 'line-servers' to serve food ... and removal of leftover foods from the serving line.

Defendant's Brief, Appendix, filed Jan. 19, 1989 (Def.App.), at 6, ¶ C–5(a)(1). Paragraph C–5 also required "preliminary preparation of ... beverages" by plaintiff's food service personnel. The contract described this duty as follows:

> Beverages: Loads, refills, and unloads beverage dispensers to include milk machines, carbonated beverage dispensers,

ice tea dispensers, and other noncarbonated beverage dispensers.

Def.App., at 6, ¶ C–5(a)(3)(b).

Paragraph C–14 set forth the work requirements for dining facilities. This paragraph required plaintiff to "[t]ransport all food from production or storage areas" to the serving lines for the lunch and dinner meals. *Id.* at ¶ C–14a(1)(a)1. Sub-part 2 required plaintiff to "[l]oad beverage dispensers."

The contract further provided that after meals "all foods and beverages (except milk) will be removed from serving and dispensing areas" by plaintiff. *Id.* at ¶ C–14a(2). The inspection checklist in Section E of the contract contained a line item about resupply of beverages. Using this form, the Army monitored plaintiff's beverage supply performance. In the section relating to food service, the checklist had three categories: satisfactory, unsatisfactory, and unsatisfactory corrected.

According to plaintiff, "[t]he issue of beverage resupply" and other differences on contract interpretation "arose shortly after commencement of contract performance on January 1, 1982." Pl.App., at 8. After more than two years of performance, plaintiff made its first formal complaint. In a letter dated March 12, 1984, plaintiff first questioned the "[r]eplenishment of beverages during meal service." Plaintiff continued to resupply beverages during meals for the duration of the renewable contract.

*Cleaning Mermite Cans*

Mermite cans are food containers which keep food warm during transportation from a dining facility to troops in the field. In the letter of March 12, 1984, plaintiff argued that its duties did not include the cleaning of mermite cans for regular Army units. The Army contends the contract required plaintiff to clean mermite cans for both regular Army and Army reserve units.

The contract paragraph entitled "Field Feeding" provided:

> a. [U]pon order, contractor shall perform post cleaning of eating utensils and compartmented trays, etc., when re-

turned to the dining facility by Government personnel, provided such equipment/utensils are returned approximately one hour prior to the time contractor personnel complete work requirements for the day.

Pl.App., at 109, ¶ C–10(a). This paragraph covered cleaning of regular Army equipment returned to the post. The contract also explicitly required plaintiff to clean field equipment for Army reserve units:

> b. [F]or US Army Reserve Units ... civilian dining facility attendants ... may be required to clean field equipment, e.g., field range outfit and accessories, insulated food containers, and immersion heaters.

Pl.App., at 109, ¶ C–10(b).

The delivery and performance section of the contract also mentioned cleaning of feeding utensils:

> Cleaning of field feeding utensils, when such equipment is returned after the ... hours of operation, plus utensils used by night bakers, shall be accomplished the following day.

Pl.App., at 128–29, ¶ F–3(b). This section (F) does not distinguish between equipment used by regular Army and reserve Army units.

The Army's inspection checklist devoted a section to the cleaning of field feeding equipment. Item 26 required plaintiff to:

> Thoroughly clean components of preparation and serving equipment used in field feeding.

Def.App., E–Table 1, at 15. The checklist did not distinguish reserve units from regular Army personnel for the cleaning of field feeding equipment.

Several attachments to the contract made plaintiff responsible for cleaning transporting equipment, including mermite cans. The attachments covered all facilities that prepared meals for troops in the field. Each attachment stated:

> The contractor will be required to perform post cleaning of serving utensils and food transporting equipment used by the dining facility to serve these meals.

Def.App., Attachment No. 6, at 19.[2] Like the resupply of beverages, plaintiff cleaned mermite cans for the duration of the contract.

*Inspection Practices*

The contract required plaintiff to clean facilities after each meal. The schedule called for completion of some tasks within 30 minutes of serving a meal. The contract stated:

> (2) After Meal Service. Not later than 30 minutes after the scheduled closing time for the serving line, all foods and beverages (except milk) will be removed from serving and dispensing areas. Food and beverages will be discarded or returned to storage....

Def.App., at 8, ¶ C–14a(2). Plaintiff's after-meal service consisted primarily of removing soiled tray carts to the dish washing area, returning empty carts, and cleaning up spilled trash or food.

The contract also required plaintiff to perform other cleaning activities within "1 hour and 30 minutes after serving each meal." Def.App., at 8, ¶ C–14a(2)(b). These activities included, among other things, wiping table tops, sweeping or mopping floors, and repositioning chairs.

The contract also granted the Army an opportunity to inspect for completion of these duties:

> (a) All services ... shall be subject to inspection and test by the Government, to the extent practicable at all times and places during the term of the contract. All inspections by the Government shall be made in such a manner as not to unduly delay the work.

Pl.App., at 122, ¶ E–1(a). Thus, plaintiff could expect inspection of "after meal service" tasks 30 minutes after the meal service and any time thereafter. Likewise, other cleanup activities were subject to inspection one hour and 30 minutes after serving each meal.

---

**2.** Attachments 6–9, 11, 13, 14, and 16–23 contain identical language that requires plaintiff to clean "food transporting equipment." The attachments include all buildings where United Food cleaned mermite cans.

In the event an inspection disclosed substandard performance, the contract gave the Army the right to require correction:

(b) If any services performed hereunder are not in conformity with the requirements of this contract, the Government shall have the right to (i) require the Contractor to perform the services again in conformity with the requirements of the contract, at no additional increase in total contract amount.

Pl.App., at 122, ¶ E–1(b). Thus, at the time of inspection the Army could demand conformance with the contract, even if plaintiff had to perform the services a second time.

The Army had to inspect without unduly delaying plaintiff's work. Plaintiff complains that the Army's inspection practices required it to perform some tasks over again.

*Additional Serving Line*

On three separate occasions, the Army sent Disposition Forms (DF) ordering an additional serving line in Building 11142. The additional serving line fed military personnel participating in Border Star 85 exercises. The DF dated February 28, 1985 required an additional serving line in Building 11142 from March 1 through March 24, 1985. A second DF, dated March 5, 1985, required United Food to provide the additional serving line from March 6 through March 31, 1985. Both DFs anticipated meal service for 200–250 personnel.[3] The third and final DF, dated March 19, 1985, reduced the extra serving line requirement to one line per meal. Captain Lawrence Rodriguez signed each DF and sent copies to plaintiff and the contracting officer. After the Border Star 85 operations, the Army no longer needed additional food serving lines at Building 11142.

Plaintiff claims that a mess sergeant demanded continuance of an additional serving line after March 1985. Plaintiff claims to have provided the additional serving line from April 1, 1985 through the end of the contract on June 30, 1986. For purposes of considering these cross-motions for summary judgment, this court accepts plaintiff's assertion that the additional serving line continued after March 31, 1985.[4]

Plaintiff did not show that an authorized representative expressly requested the additional serving line after March 1985. Plaintiff suggests that the mess sergeant at Building 11142 may have communicated a need for the additional serving line, but does not claim that the mess sergeant was acting with authority.[5] For purposes of ruling on the cross-motions for summary

---

3. Louis Saiz, the contracting officer's representative, submitted an affidavit after reviewing the records concerning personnel fed at Building 11142 from April 1985 through the end of June 1986. The affidavit reveals that the greatest headcount number was in April 1985 (732), and the lowest headcount was in January 1986 (230), with an average headcount of 384 for the entire period. Defendant's Brief, filed Jan. 19, 1989, Appendix (Def.App.), at 106–07.

4. Edwin J. Coyle, President of United Food stated:

United [Food] continued to perform additional requirements as ordered by dining facility personnel in Building 11142 for the period after March 31, 1985, consistent with the system in effect at Ft. Bliss for the duration of [the] contract.

Plaintiff's Appendix, filed Feb. 21, 1989 (Pl. App.), at 23.

5. The following exchange took place during oral argument on the cross-motions for summary judgment:

THE COURT: Why don't you stop then when the effective period ends?

MR. PURDY: Because the mess sergeant says, tomorrow, April 1st we are going to run with two lines at this time. And, that is the way things worked. I don't know if the mess sergeant didn't get the word or what. But, we have to do what that gentlemen requires because that is the way the authority was delegated in the performance of this food service contract. The mess sergeants ran their facilities. They let the contractor know when we were going to start, how many serving lines we are going to have.

THE COURT: Did he specifically say on March 25th you still have the other service line up?

MR. PURDY: Let's say April 1st because I don't think that there is any dispute about the March time frame....

....

[I] do not know and it will be an issue of fact for this Court to resolve; exactly the communication that the mess sergeant gave to our people during that time.

judgment, this court accepts plaintiff's assertion that the mess sergeant in Building 11142 requested the additional serving line for the duration of the contract.

In denying plaintiff's claim for additional headcount in Building 11142, the contracting officer stated:

> The claimed cost ... for increased headcount is disallowed as the effect was a decrease and considerably lower than the 800 daily meals authorized.... The actual head count for this facility for the time period after March 1985 through 30 June 1986 has been provided....

Plaintiff's Complaint, filed Jan. 22, 1988, Exhibit 3, at 6. Modification P00024 to the contract provided that Building 11142 would have an estimated headcount of 800 for the duration of the contract.

According to the contract, the parties executed DFs to effect modifications.[6] Each DF included a termination date for the extra service. According to the DFs, dining services at Building 11142 should have reverted to normal operation at the end of March 1985.

On July 15 and 29, 1986, plaintiff submitted certified claims for an equitable adjustment to the agreement, pursuant to the change clause in the contract.[7] United Food alleges that defendant "either expressly or constructively" ordered the performance of services not mentioned in the contract. Plaintiff seeks compensation for these services.

The Army contends that the change clause does not apply because the contract required the performed services. Although not listed in the Technical Specifications section of the contract, the services at issue appeared in the inspection checklist used by the Army to evaluate performance. This checklist was part of both the solicitation and the original contract.

Tr., at 65–66.

**6.** Section F provided:
Only those services outlined in this contract are required. All requests for additional services made to the contractor by dining facility personnel will not be performed until properly contracted for.

This case is before the United States Claims Court following a final decision by the contracting officer, as required by the Contract Disputes Act. 41 U.S.C. § 609 (1982). The contracting officer allowed and denied several claims in their entirety, and granted partial relief in others.

## DISCUSSION

Pursuant to RUSCC 56, the parties cross-move for summary judgment. Both parties claim entitlement to judgment as a matter of law. Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Sweats Fashions v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987).

This court uses the salutary procedure of RUSCC 56 because an examination of the submissions of the parties reveals that no material fact remains in dispute. Thus, these motions avoid "unnecessary expense to the parties and wasteful utilization of ... judicial resources." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed.Cir.1984).

When both parties have moved for summary judgment, this court applies the law as set forth by the United States Court of Appeals for the Federal Circuit:

> [T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Mingus Constructors v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987) (citations omitted). With these standards in mind, this court reviews the pending claims to determine whether any factual disputes prevent the entry of judgment.

Pl.App., at 129, ¶ F–4.

**7.** The change clause provided that if the contracting officer made unilateral changes that either increase or decrease the cost of performance of any part of the contract, then the Army would adjust the contract price to reflect the change. Def.App., at 74.

With regard to contract interpretation, this court must follow:

> established general rules that provisions of a contract must be so construed as to effectuate its spirit and purpose, that it must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions, and that an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.

*Julius Goldman's Egg City v. United States,* 697 F.2d 1051, 1057–58 (Fed.Cir. 1983), (quoting *Arizona v. United States,* 216 Ct.Cl. 221, 235–36, 575 F.2d 855, 863 (1978)).

### Beverage Resupply

The contract required plaintiff to resupply, and plaintiff did in fact resupply, the beverage dispensers during each meal. The dispute centers around whether this service was part of the contract or an added requirement.

▬ This court must read the contract to give meaning to all terms. This court may not consider any contract term meaningless. *Hol–Gar Mfg. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972 (1965). Thus, reading the contract as a whole, this court determines that the contract required beverage resupply services. The interaction between the specifications in Section C and inspection standards in Section E show that the contract required plaintiff to resupply beverages during meal times.

Item 2C on the inspection form, located at pages 36–38 of the contract, specifically required plaintiff to resupply beverages.[8] This explicit provision precluded plaintiff's claim because the inspection checklist was part of the solicitation. Moreover, the contract incorporated the inspection form. Therefore, plaintiff was on notice of the resupply requirement.

Further, ¶¶ C–5(a) and C–4 of the contract specified plaintiff's responsibility for resupplying the beverage dispensers during meals. Paragraph C–5(a) required the contractor to resupply the "serving line." Def.App., at 6. Other contract provisions made beverages part of the serving line.

Although ¶ C–5(a) did not explain the term "serving line" in detail, other parts of the contract, such as ¶ C–4 gave meaning to the phrase. Def.App., at 5. Paragraph C–4 listed the relevant regulations applicable to the contract. Chapter 14 of FM 10–25, a regulation referred to in ¶¶ C–4 and C–5, concerned "serving." This regulation gave specifications for the serving line and recommended a placement sequence for the equipment. The text and accompanying pictures included beverage dispensers. With the inclusion of beverage dispensers in the serving line sequence, the explicit requirement of resupplying the serving line during meals included the resupplying of beverage dispensers.

The parties do not dispute that the contract included ¶ C–5 as part of the original technical specifications. Accordingly, plaintiff's performance of this task was not extra-contractual. The contract required United Food to resupply the beverage dispensers during each meal. Any other interpretation by this court effectively would disregard the inspection form and the language of FM 10–25.

The requirements contained in the inspection checklist were part of the solicitation and contract. Plaintiff argues that "inspection forms are used to *check* requirements, not *create* them." Plaintiff's Response, filed Feb. 21, 1989 (Pl.Resp.), at 14–15 (emphasis in original). Plaintiff asserts that the contract required only those tasks mentioned in the contract specifications, not tasks covered by the inspection form. Based on this reasoning, plaintiff claims that all services (including the refilling of the beverage dispensers) not explicit-

---

8. On April 13, 1984, the parties revised the inspection checklist. The beverage resupply requirement remained the same. Renumbering of the item on the inspection form was the only change. Thus, the item entitled resupplying of the beverage dispensers became item 1.b(3). Def.App., at 88–92.

ly mentioned in Section C, are extra-contractual.

The terms and specifications of a Government contract necessarily include all items included in the schedule, general provisions, and attachments. The inspection checklist was part of the contract. Moreover, plaintiff possessed the inspection forms at the time of contracting. These checklists put plaintiff on notice of the beverage resupply requirement at the time plaintiff formulated its bid. The standards in Section C and the inspection form both required the resupply of beverages during meals. Therefore, plaintiff was responsible to resupply beverages.

United Food further claims the Army was on notice that plaintiff did not interpret the contract as requiring beverage resupply during meals. Pl.Resp., at 14. Plaintiff filed a Certificate of Competency (COC) with the Small Business Administration (SBA) after the Army initially rejected its bid as being too low. The COC application required plaintiff to state with specificity its interpretation of the contract requirements. United Food did not include the resupply of beverages in the "During Meal Services" portion of the COC. Therefore, plaintiff argues that the Army was on notice of its interpretation of the contract requirements.

The Army's receipt of notice is only relevant if the contract terms were ambiguous. No such ambiguity existed. The contract clearly established plaintiff's duty to resupply beverages. The attempt to introduce the COC as constructive notice of plaintiff's interpretation attempted to question portions of the contract where no ambiguity existed. This court detects no ambiguity in the contract.

■ If plaintiff had discovered an ambiguity, then it had an affirmative duty to bring the ambiguity to the Army's attention. *Blount Bros. Constr. Co. v. United States*, 171 Ct.Cl. 478, 496, 346 F.2d 962, 973 (1965). The COC, however, did not provide the Army adequate notice of an ambiguity. The purpose of the COC was limited. The COC permitted SBA to determine that plaintiff could perform at a cost

less than the Army's estimate. The COC did not notify the Army of disputes about contract terms. The mere filing of a COC with the SBA did not give the Army notice of a patent ambiguity in the contract.

Indeed, this court must read the contract "as a whole, rather than isolating particular terms and attempting to glean their meaning outside of their intended context." *Tilley Constructors & Eng'rs v. United States*, 15 Cl.Ct. 559, 563 (1988). Plaintiff has not shown that this court should accord the inspection checklist less weight than other parts of the contract. These contract provisions show that plaintiff had the duty to resupply beverages.

### Cleaning Mermite Cans

■ Three separate parts of the contract addressed the cleaning of mermite cans or field feeding equipment. Paragraph C–10(a) did not require plaintiff to prepare and serve meals in the field. The same paragraph, however, required United Food to "perform post cleaning of eating utensils and compartmented trays, etc., when returned to the dining facility by Government personnel...." In summary, ¶ C–10(a) required cleaning of "equipment/utensils" returned from the field by regular Army units.

The terms "trays, etc." and "equipment/utensils" encompassed mermite cans. Mermite cans are equipment used to feed units in the field. The references to "trays, etc." suggested that equipment beyond trays used to feed troops in the field would fall within plaintiff's cleaning responsibilities.

Paragraph C–10(b) required broader duties for meals served to Army reserve units. The contract required United Food to make dining facility attendants available "outside established dining facilities in cantonment areas." Further, the contract required United Food to clean the full spectrum of accessories from a field kitchen. Paragraph C–10(b) required plaintiff to move serving operations into the field.

Read together, the intent of ¶¶ C–10(a) and C–10(b) is clear. Plaintiff would clean

"utensils and compartmented trays, etc." for all Army units upon return of the "equipment/utensils" to the dining facility. The terms "etc." and "equipment" include mermite cans and serving utensils.

United Food argues that it is exempt from cleaning mermite cans because ¶ C–10(b) states that the contractor "may be required to clean field equipment" including insulated food containers.[9] Plaintiff contends that this permissive language leaves it without an obligation to clean the mermite cans. The rest of the contract, however, including the inspection form and the attachments, clarify plaintiff's obligation.

Item 26 of the inspection form required plaintiff to "thoroughly clean components of preparation and serving equipment used in field feeding." Moreover, the contract attachments specifically required plaintiff to "perform post cleaning of serving utensils and food transporting equipment." Def.App., at 19. Thus, reading the contract as a whole, giving ordinary meaning to its phrases, and harmonizing conflicting provisions,[10] this court concludes that the contract required plaintiff to clean mermite cans for all Army units.

*Inspection Practices*

■ Plaintiff complains that it incurred additional costs preparing for inspections within two hours after each meal. The contract clearly allowed the Army to inspect and require reperformance if plaintiff did not meet standards of cleanliness. Plaintiff must bear these additional costs. Paragraph E–1(b) of the contract specifically mandated reperformance of unsatis-

factory work without an increase in contract compensation. The only limitation on Government inspectors was the requirement to avoid "unduly delay[ing] the work."

Plaintiff expected to have the entire time between meals to perform "after meal" tasks. In a May 31, 1984 letter to the contracting officer, plaintiff's attorney stated:

> The most serious problem arises in connection with "after meal" jobs. United is entitled to the entire period from the end of one meal to the beginning of the next meal to perform such "after meal" tasks.

The contract contemplated that plaintiff would complete after-meal tasks and undergo inspection prior to the next meal. Paragraph C–14a(2)(b) listed plaintiff's duties for the period following each meal. The contract required plaintiff to complete these tasks no later than 90 minutes after each meal. Plaintiff, however, had to remove food and beverages from the dispensing area within 30 minutes after the meal.

United Food challenges the Army's inspection practices as imposing a "100% simultaneously clean requirement." If the Army was unsatisfied with the performance of a task, it required United Food to redo it. This practice was consistent with the inspection standard set forth in ¶ E–1.

Paragraph E–1(a) of the contract stated that plaintiff's services were subject to inspection "to the extent practicable at all times and places during the term of the contract." Further, ¶ E–1(b) allows the Government to require reperformance or assess a deficiency. Thus, the Government

---

**9.** At one point, responding to repeated letters from plaintiff's counsel, the contracting officer stated that United Food only needed to clean mermite cans used by reserve Army units. This interpretation was in the form of a letter, not a contract modification, and thus did not change plaintiff's duties.

**10.** The contract contained an Order of Precedence clause to resolve inconsistencies between the specifications and other provisions of the contract. The Federal Circuit has observed that the purpose of the Order of Precedence clause is to resolve inconsistencies between various

clauses in the contracts. *See, Sperry Corp. v. United States,* 845 F.2d 965, 967–68 (Fed.Cir. 1988). Thus, the contract gives precedence to the inspection form and the attachments. The inspection form and the attachments clearly contemplate that United Food will clean all mermite cans. The inspection form fairly contemplates a thorough cleaning of "components of preparation and serving equipment used in field feeding." The attachments required United Food to clean "serving utensils and food transporting equipment ... used to serve these meals."

was only exercising its right as defined by the contract. The Government inspectors were reasonable in exercising their judgment and discretion. Plaintiff's president admitted that the inspections took place "ninety minutes to two hours after the end of the meal." Pl.App., at 19.[11]

The Government set the times and standards for inspection in a reasonable manner consistent with the provisions of the contract. Sections C and E provided for inspection within 90 minutes of the meal and were both part of the contract. Plaintiff was not entitled to the entire period between meals to perform cleaning tasks. Accordingly, plaintiff may not recover additional compensation due to the Army's inspection practices.

### Additional Serving Line

For purposes of this motion, the parties agree that plaintiff operated an additional serving line in Building 11142 from April 1, 1985 through June 30, 1986. The Army requested additional services in a DF on February 28, 1985. The DF required additional services from March 1 through March 24, 1985 to accommodate operation Border Star 85. Operation Border Star 85 brought 200–250 additional personnel to eat at Building 11142. On March 5, 1985, the Army paid plaintiff for the extra serving line during the month of March 1985.

■ Plaintiff, however, claims that the Army required the additional serving line in Building 11142 through June 1986. Thus, plaintiff seeks to enforce an implied contract extending the same terms of the February and March DF's through June of the following year. To succeed, plaintiff must prove existence of an implied-in-fact contract. The requirements for an implied-in-fact contract are the same as for an express contract. *Russell Corp. v. United States*, 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976). Thus, United Food must establish:

[M]utuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the government in contract.

*H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984); *Alexandria v. United States*, 737 F.2d 1022 (Fed.Cir. 1984); *Cutler–Hammer v. United States*, 194 Ct.Cl. 788, 441 F.2d 1179, 1182 (1971).

■ Plaintiff contends that the mess sergeant in Building 11142 required the additional serving line to remain open for an additional 15 months. The nature of the mess sergeant's orders is not clear; his lack of authority, however, is readily apparent. Section F of the contract provides that "[a]ll requests for additional services made ... by dining facility personnel will not be performed until properly contracted for." Pl.App., at 129. In the circumstances of this case, the issuance of a DF by Captain Rodriguez in charge of food services satisfied the "properly contracted for" language in Section F of the contract. United Food, however, produces no DF covering the added 15 months, but relies on the oral directions of the mess sergeant.

Plaintiff knew or should have known that oral directives could not change the contract. On three occasions, plaintiff received DFs that gave a beginning and ending date for additional serving lines. The forms instructed plaintiff to provide the additional serving line in conjunction with the Border Star 85 exercises. Captain Rodriguez signed the DFs, not the mess sergeant. None of the DFs required plaintiff to provide an additional serving line beyond March 31, 1985. These formal DFs defined the bounds of the added serving line requirement.

Plaintiff's reliance upon the mess sergeant's request fails because the sergeant did not have contracting authority. The mess sergeant lacked authority for two reasons. First, Section F of the contract explicitly stated that dining facility person-

---

**11.** If United Food had to perform weekly, monthly, or quarterly tasks on a daily basis, they would have submitted copies of completed inspection forms showing that the Army required it to perform these tasks on a more frequent basis. United Food has not shown any inspection form with an unsatisfactory rating subsequently corrected and a second form requiring reperformance of the same task prior to the end of the time period for that task.

nel had no contracting authority. Second, as plaintiff knew or should have known, Captain Rodriguez was the officer authorized to continue the additional serving line.

Moreover, the headcount at Building 11142 shows that the Army did not need the added serving line. By affidavit, Louis Saiz, the contracting officer's representative, gave the average daily headcount from April 1985 through the end of the contract. The headcount showed a downward trend during the final 15 months of the contract. Only once, in April 1985, did the average daily headcount at Building 11142 ever exceed the estimate of 690 set forth in modification P00024. Def.App. at 86, 106–07. The average headcount for the entire 15–month period was 384 per month, approximately half the number authorized by the contract as modified.

█ Plaintiff cannot argue that Captain Rodriguez authorized the added serving line by knowingly acquiescing to its continuation. The contracting officer had no way of knowing that plaintiff continued the added serving line beyond the cut-off date. The Army monitored meals by the number served and the average daily headcount, not the number of lines in operation. With an average headcount, the contracting officer had no basis to suspect that the additional serving line continued beyond March 1985.

In contrast to established procedure and Section F of the contract, United Food provided the additional serving line "as ordered by dining facility personnel" without a DF that set forth the time frame for continued performance. United Food did not seek the approval of the contracting officer to comply with the mess sergeant's report; rather, it continued to provide a second serving line at its own risk. Moreover, plaintiff has not claimed that the mess sergeant who ordered the service had the actual authority to contractually bind the Government.

Plaintiff argues summary judgment is not appropriate for this issue because of a disputed issue of fact regarding an alleged "course of dealing" between the parties.

United Food claims that the Army often implemented changes in the dining facilities before expressly modifying the contract.

The contract, however, dictates procedures for modifying the contract:

> The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in the definition of services to be performed, and the time (*i.e.*, hours of the day, days of the week, etc.) and place of performance thereof.

Def.App., at 74, DAC # 76–41, Dec. 27, 1982. The change clause specifically required a "written order" from the "contracting officer" to effect any change.

This procedure operated well. The record shows that Captain Rodriguez promptly issued a signed DF setting forth the Army's added serving line needs. Plaintiff now contends that the Army issued no DF reminding plaintiff of the cut-off date. However, the initial DFs that ordered the new service included an ending date as well as a beginning date.

█ Further, plaintiff's current argument does not follow these parties' course of dealing. The Army and plaintiff dealt with one another via DFs. A course of dealing is:

> A sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

RESTATEMENT (SECOND) OF CONTRACTS § 223 (1981). All of the written communications between plaintiff and the Army contain a date when the requested service begins and a date when it ends. Even assuming that the mess sergeant requested the additional serving line, the parties had a prior course of dealing that required the issuance of DFs. Every DF contained a specific time for performance to begin and to end. Thus, the common basis of understanding between the parties required a written DF to confirm any ex-

tension of service beyond the written ending date.

Finally, the Federal Circuit has summarized the requirements for a valid implied-in-fact contract:

> Oral assurances do not produce a contract implied-in-fact until all the steps have been taken that the agency procedure requires.... Where an approving official exceeds his authority, the government can disavow the official's words and is not bound by an implied contract.

*New Am. Shipbuilders, Inc. v. United States,* 871 F.2d 1077, 1080 (Fed.Cir.1989) (citations omitted). Assuming that the mess sergeant did order the additional serving line in Building 11142, plaintiff may not recover because the DF was not issued as required by Army procedure. The mess sergeant had no authority to bind the Government. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

### Contract Renewals

Plaintiff renewed this contract each year from January 1982 to 1986. The issues, other than the serving line in Building 11142, arose at the onset of contractual relations. Plaintiff complained orally, but made no formal objections, until March 1984—two years after performance began. Even after its written complaints, United Food continued to renew the contract yearly, with terms and conditions "unchanged and in full force and effect." Pl.App, at 237, 239. Plaintiff knew of the Government's position before signing the successive yearly contracts. As the Court of Claims has held:

> If one party to a contract knows the meaning that the other intended to convey ... then he is bound by that meaning.

*Cresswell v. United States,* 146 Ct.Cl., 119, 127, 173 F.Supp. 805, 811 (1959). This court cannot consider the reasonableness of the parties' interpretations in a vacuum. Plaintiff knew of the Army's interpretation of the contract at the onset of performance. Thereafter, plaintiff continued to execute successive contracts with that knowledge. Moreover, plaintiff continually attempted to sway the contracting officer to its interpretation, while signing each successive contract willingly, without implementing changes.

Under these circumstances, plaintiff accepted and followed the Army's initial interpretation of the clauses in question through several re-executions of the contract. The time for plaintiff to have resolved these questions has long since passed. The yearly renewals and plain meaning of contract terms justify following the Army's interpretation of the contract.

### CONCLUSION

Plaintiff has failed to demonstrate that a genuine issue of material fact remains in dispute. In light of the foregoing, plaintiff is not entitled to recover on any of the claims stated in its complaint.

In the absence of a genuine issue of material fact, this court grants defendant's motion for summary judgment. This court also denies plaintiff's cross-motion for summary judgment. This court directs the Clerk of the court to enter judgment for the United States and to dismiss plaintiff's complaint.

No costs.