E.I. DU PONT DE NEMOURS
AND COMPANY, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 311–89 C.

United States Claims Court.

Dec. 5, 1991.

Daniel M. Gribbon, Washington, D.C., for plaintiff. Alan A. Pemberton, Thomas E. Baker, and Lawton A. Burrows, of counsel.

Terrence S. Hartman, U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

HODGES, Judge.

The President of the United States asked E.I. Du Pont De Nemours and Company (DuPont) to perform a vital service in 1950:

to design, construct, and operate a facility for nuclear production for the nation's defense program. DuPont's response was the Savannah River Plant near Aiken, South Carolina.

For various reasons, plaintiff did not want to make a profit from the Savannah River project, but it did not want to bear any losses either. The result was an unusual contract whereby the United States agreed to indemnify DuPont from virtually all costs and expenses of the project, specifically including "all welfare and employee relations plans, policies and practices of the Contractor."

Plaintiff had a severance payment policy which paid DuPont employees generously when they were terminated for lack of work. Plaintiff interpreted the term "lack of work" to mean "lack of work with DuPont." Defendant repeatedly urged plaintiff to discard the policy as applied to successor contractors. That is, if the project were taken over by another contractor, and the contractor agreed to hire all DuPont employees, there would be no loss of work and no reason for severance pay.

Plaintiff and defendant apparently agreed to disagree over the years, and did not resolve the issue until 1985. Thereafter, Westinghouse assumed responsibility for the Savannah River Project. Westinghouse retained most of DuPont's employees, as it had promised the federal government. Defendant notified plaintiff that severance payments to its employees under the circumstances would not be appropriate, and in fact would not be reimbursed by the government. DuPont made approximately $64 million in payments to its employees anyway, and defendant refused to reimburse these payments.

The issue is whether severance payments made in accordance with plaintiff's severance policy are reimbursable costs under the terms of the contract between plaintiff and defendant. Both parties filed motions for summary judgment. For the reasons stated herein, and during oral argument on June 4, 1991, plaintiff's cross-motion for summary judgment is GRANTED; defendant's motion for summary judgment is DENIED.

## FACTS

### 1. Background

In 1950, plaintiff E.I. Du Pont De Nemours and Company (DuPont) embarked on a project at the request of President Harry S. Truman. The task was to produce nuclear materials for the nation's defense program; the project was the design, construction, and operation of nuclear production facilities which became known as the Savannah River Project. The President felt that it was a task plaintiff was "uniquely qualified" to perform.

DuPont had supplied the Army with plutonium for the Manhattan Project during World War II. Partly as a result of its experience with that contract, plaintiff did not want to make a profit from the Savannah River Project. The result was a contract by which the United States paid plaintiff a nominal fee of $1.00 and agreed to reimburse DuPont for all costs and expenses incurred under the agreement. While DuPont did not want a profit on the project, it did not want to bear any of the costs of its services. Therefore, the contract was unusual in the breadth of its indemnity clause. By Article XXXIV, defendant indemnified plaintiff from all costs and expenses excepting only willful or bad faith misconduct by corporate officers, and costs specifically listed as non-reimbursable in the contract.

Article XV of the contract provided for the reimbursement of any "costs and expenses incurred ... with respect to all welfare and employee relations plans, policies and practices of the Contractor." Reimbursement under this article was not conditioned upon prior approval from the government so long as the costs were incurred pursuant to policies that were not implemented specifically for the Savannah River Project.

DuPont's employee relations policy was an important issue from the beginning of negotiations between plaintiff and defendant in 1950. Plaintiff added a severance

plan in 1956 which admittedly was very generous. However, defendant knew about this plan and discussed it repeatedly with plaintiff until 1984, when the matter finally was resolved.

Plaintiff testified before a Joint Congressional Committee on August 4, 1950 that it intended to treat the employees transferred to Savannah River in the same manner as those on its commercial side. Plaintiff warned the Committee of the unusually generous nature of DuPont's benefit policy as compared to the industry standard. Plaintiff explained to the Committee that it wanted the government to know of this progressive attitude toward its benefit plans up front, for fear that they might be a potential source of contention regarding the government's obligation to reimburse.

Another feature of this contract made it unusual. President Truman exempted the agreement between DuPont and the Atomic Energy Commission from those provisions of law relating to contracts which could raise any question as to the validity or enforceability of the agreement. This order was issued by President Truman on September 27, 1950, pursuant to section 12(b) of the Atomic Energy Act of 1946 (now codified at 42 U.S.C. § 2202 (1988)), upon his finding that "such action is in the interest of the common defense and security...."

### 2. Severance Pay

In 1956, plaintiff informed the government of its new employee termination plan, "Treatment To Be Accorded Employees Terminated on Account of Lack of Work." A terminated employee would receive one week's salary for each year's service with DuPont. Conditions of payment were (1) involuntary termination from the permanent employment roll of the company, and (2) termination caused by lack of work. The severance plan formalized DuPont's long-standing practice, but it was more liberal. It superseded the layoff-notice policy which provided for either a notice period or a week's pay when termination was attributed to lack of work.

Plaintiff informed the government that it considered these payments to be a reimbursable cost because this was a corporate policy applicable to all permanent employees. No distinction would be made between plant shutdowns and other types of termination for lack of work. The government withheld formal concurrence because the plan could apply to a successor contractor. In such a situation plaintiff's employees likely would be retained by the successor, and therefore a "lack of work" would not exist.

Plaintiff confirmed that it intended to apply the plan even in a successor contractor situation. Plaintiff's position stemmed from the company's belief that its employees had developed expectations of continuing career employment with DuPont. If such opportunities were lost, the employees should be compensated.

The parties' views on the severance pay issue were at odds during subsequent extensions of the contract. In 1959, the government modified its own severance pay policy by prohibiting the reimbursement of severance payments made under such circumstances. During negotiations for contract renewals, the government repeatedly asked plaintiff to make the severance payment plan at Savannah River consistent with the government's. Plaintiff refused.

In 1984, plaintiff finally agreed that severance payments made in a successor contractor situation would be non-reimbursable. This amendment was effective October 1, 1985. In an internal government memo, the negotiating team for the government considered this effort "a significant accomplishment of the negotiations."

At about the same time, plaintiff reevaluated its severance pay practice on DuPont's commercial side. A terminated employee no longer would be entitled to severance pay if offered a similar position with the purchaser in a divestiture. However, plaintiff did not repudiate its obligation for services performed before the modification. Rather, it froze this obligation at the October 1, 1985 level.

### 3. Westinghouse

In 1987, plaintiff advised the government that it would not seek renewal of its contract in 1989. Westinghouse–Savannah River Corporation (Westinghouse) assumed operation of the Savannah River Project and agreed to hire existing DuPont employees at comparable positions and wages.

Plaintiff announced its intention to make severance payments to its employees at Savannah River. The Secretary of Energy instructed plaintiff to reconsider its decision to make severance payments, and warned that the government would not reimburse plaintiff for those costs. The government did not want to set such a precedent.

Plaintiff proceeded to distribute severance payments totalling $64,410,742.11 to its Savannah River employees. It submitted a certified claim for reimbursement on March 31, 1989 pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988). The Contracting Officer denied plaintiff's claim in a May 30, 1989 decision, and plaintiff filed suit in this court.

### DISCUSSION

The issue in this case is whether the contract requires defendant to reimburse plaintiff for severance payments to its employees. Contract interpretation is a matter of law. *Craft Machine Works Inc. v. United States*, 926 F.2d 1110, 1113 (Fed. Cir.1991). No material facts are in dispute.

### 1. Rules of Contract Interpretation

■ The goal of the court is to ascertain and give effect to the intention of the parties as expressed in their writing. *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 524 F.2d 680, 684 (1975). In so doing, the court does not seek to discover the "subjective unexpressed intent of one of the parties." *ITT*, 524 F.2d at 684 (citing *Dana Corp. v. United States*, 200 Ct. Cl. 200, 470 F.2d 1032, 1041 (1972)); *John C. Kohler Co. v. United States*, 204 Ct.Cl. 777, 498 F.2d 1360, 1365 (1974).

Rather, the court must look to the objective language of the instrument and construe the contract as a whole. Normally, "the plain and unambiguous meaning of [the] written agreement controls." *Craft Machine Works*, 926 F.2d at 1113 (citing *George Hyman Constr. Co. v. United States*, 832 F.2d 574 (Fed.Cir.1987)). The court must ascribe reasonable and effective meaning to all provisions of the contract rather than leaving some parts meaningless or superfluous. *Arizona v. United States*, 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978); *United Food Services, Inc. v. United States*, 19 Cl.Ct. 539, 545 (1990), *aff'd*, 928 F.2d 411 (Fed.Cir.1991) (Table).

### 2. General Indemnity

■ The language of this contract is clear and unambiguous. Unless an item is considered non-reimbursable under Section 4 of Article XV, the government must indemnify and hold plaintiff harmless against any cost arising out of or connected with the work. The severance payments were costs under the contract and were connected with plaintiff's operations at the Savannah River Project. The parties do not dispute these points.

Plaintiff argues that the general indemnity section should be interpreted to mean that no matter what else the contract may provide, the government must reimburse plaintiff so long as a cost was incurred in connection with the work. Citing the clause "unpredictable hazards" in the general indemnity section, defendant contends that its purpose was to protect plaintiff from liability for nuclear hazards, not every type of expense associated with the contract.

Defendant's argument that the general indemnity applies only to nuclear hazards takes one clause out of context to narrow the meaning of this section. Such an interpretation renders inoperative other portions of the indemnity section which explain its purpose. It is true that the government indemnified plaintiff from "unpredictable hazards" associated with the contract work; but the government also agreed to indemnify plaintiff because of the "nature, scope, and magnitude of the work. . . ." The latter clause expresses better the breadth of this section.

The contract provision captioned Article XL—NUCLEAR HAZARDS INDEMNITY specifically addresses the government's responsibility to protect plaintiff against the risk of "a nuclear incident." This provision is devoted to situations in which the government would indemnify plaintiff against personal and property liability caused by nuclear accidents. Defendant's reading of Article XXXIV, the general indemnity clause, makes Article XL redundant.

Defendant contends that plaintiff's construction of the general indemnity clause is unreasonably broad, that no rational businessman would have agreed to essentially a carte blanche arrangement in plaintiff's favor. The circumstances under which this contract was conceived were unique. Plaintiff developed the project at the government's request; it did not seek the work. Plaintiff emphasized that it would not receive any profit from this undertaking, and it wanted the government's assurance that defendant would cover all costs and expenses. Such assurance guided plaintiff's negotiation of the contract.

The basis of the agreement was no profit-no loss. In ascertaining the meaning of a contract, courts have favored an interpretation of contractual provisions that will advance "the spirit and purpose of the contract." *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 591 F.2d 629, 633 (1979); *see also Cherry Hill Sand & Gravel Co. v. United States,* 7 Cl.Ct. 357, 360 (1985). A reading consistent with the "spirit and purpose" of this contract is that the government is liable for any cost not considered non-reimbursable under Article XV, Section 4.

The United States tried to persuade plaintiff to limit the effect of the indemnity clause. However, it signed each successive extension willingly and without implementing the changes. Defendant cannot now complain that the indemnity clause was unreasonably broad. The plain language of the contract demonstrates that plaintiff's interpretation of the general indemnity clause is the reasonable one.

Defendant asks the court not to enforce an obligation that it voluntarily and knowingly assumed but no longer wishes to honor. The parties are sophisticated and well able to care for themselves. The contract was extended numerous times over a 40–year period. If defendant felt that the indemnity provision was unduly broad or if it attached a meaning different from the plain language, defendant should have driven a harder bargain, earlier.

3. The 1984 Contract Amendment

Article XV, Section 4 lists several exceptions to the broad indemnity language. In 1984, the parties agreed that severance pay based on service performed after October 1, 1985 would not be reimbursable in a contractor changeover situation. This agreement, referred to as "the 1984 amendment," was incorporated into the contract as a non-reimbursable item. The provision reads:

> u. Severance pay based on years of service under the Contract *after October 1, 1985,* to employees who have been employed or offered employment with a replacement contractor where continuity of employment with credit for prior length of service is preserved under substantially equal conditions of employment. (emphasis added)

The 1984 amendment at Section 4(u) prohibits the reimbursement of severance pay based on service performed after October 1, 1985 if a successor contractor provides continued employment. Defendant argues that this section's failure to mention severance pay based on services *before* October 1, 1985 does not make those services reimbursable. It does not make them non-reimbursable either. This language not only allows reimbursement of such payments but also confirms the intent of the parties that such payments would be reimbursed.

Nothing in the language of Section 4(u) bars reimbursement of severance payments for services performed prior to October 1, 1985. Defendant's reading of the 1984 amendment ignores the phrase "after October 1, 1985" and enlarges its plain meaning. The 1984 amendment cannot be interpreted as extinguishing any obligations the

government had to reimburse severance payments earned prior to October 1, 1985.

#### 4. "Lack of Work"

■ The essence of defendant's third argument is that the severance plan applies only to a lack of work situation. No lack of work occurred because all Savannah River employees were rehired by Westinghouse. This raises the issue of the meaning of the phrase "lack of work."

■ The ordinary and clear meaning of a phrase normally controls. "Lack of work" as commonly used refers to unemployment. However, the courts should consider the words of a contract in accordance with the meaning given to them by one party if the other party had reason to know of that meaning. 3 A. Corbin, *A Comprehensive Treatise on the Rules of Contract Law* § 543 (1960). Defendant knew that plaintiff interpreted "lack of work" to mean lack of work at DuPont.

When DuPont first announced its severance payment plan, the government declined to agree because the plan permitted payment in the contractor replacement situation. When the issue was raised in subsequent negotiations for contract extensions, plaintiff conceded that its policy would result in a windfall for terminated employees who were rehired by a purchaser or successor contractor. Nonetheless, plaintiff insisted that its policy was consistent with the company's philosophy of preserving its employees' expectations of a career with DuPont.

DuPont informed the government that it implemented the severance payment policy in divestiture situations irrespective of whether the purchaser rehired its employees. Such was plaintiff's position until the 1984 amendment. Defendant had reason to know of plaintiff's meaning of the phrase "lack of work," and defendant is charged with that knowledge.

#### 5. Consistent Application

■ Defendant contends that plaintiff is not entitled to reimbursement because DuPont had not applied the severance policy consistently on its commercial side as required by the contract. It points to several divestiture situations in which plaintiff did not make severance payments to employees who were rehired by the purchaser without significant interruptions in employment.

It is true that plaintiff did not always make severance payments to employees rehired by a purchaser. However, plaintiff accomplished the same objective by arranging sign-up bonuses. The bonuses were equal to or greater than the severance amounts that an employee would have received. If a purchaser agreed to pay the bonuses, plaintiff would reduce the purchase price accordingly. The effect was the same as if plaintiff made severance payments directly. Plaintiff's severance practices were substantially consistent within its company and were not barred by Article XV of the contract.

Defendant cites *Lakey v. Remington Arms Co.*, 874 F.2d 541 (8th Cir.1989), to demonstrate plaintiff's inconsistent interpretation of "lack of work" in its severance pay policy. *Lakey* involved a DuPont subsidiary which failed to make severance payments to employees hired by a successor contractor. Plaintiff has shown that the subsidiary historically applied the phrase "lack of work" in its severance pay policy in a manner different from DuPont's. This does not detract from a finding that plaintiff's policies were substantially consistent throughout its system.

### CONCLUSION

The United States must comply with the unambiguous terms of its contract, however generous they may have been to employees of DuPont. The Clerk will enter judgment for plaintiff in the amount of $64,410,742.11 plus interest calculated pursuant to 41 U.S.C. § 611 (1988). No costs.